IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BLUEFIELD

BENNY RAY ROBERTS,

      Petitioner,

v.                            Case No. 1:13-cv-23245

DAVID BALLARD, Warden,
Mount Olive Correctional Complex,

      Respondent.


## PROPOSED FINDINGS AND RECOMMENDATION

On September 19, 2013, the petitioner filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254.  (ECF No. 1).  The petitioner is serving a sentence of 15 years to life in prison after having been convicted by a jury of one count of first degree murder with a recommendation of mercy in the Circuit Court of Mercer County on October 8, 2008.  Pending before the court is the respondent's Motion for Summary Judgment.  (ECF No. 12).  This matter is assigned to the Honorable David A. Faber, Senior United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

## PROCEDURAL HISTORY

On June 19, 2007, a Mercer County Grand Jury returned an indictment charging the petitioner with one count of Murder in the First Degree concerning the death of Losey Lee Bennett.  (*State v. Roberts*, Case No. 08-F-241-WS) (ECF No. 12, Ex. 1).  The

petitioner was represented at trial by attorneys Michael Cooke and Jason Grubb. The State was represented by Scott Ash, Assistant Prosecuting Attorney for Mercer County.

On October 8, 2008, the jury returned a guilty verdict on the theory of felony murder, but recommended that the petitioner receive mercy. Accordingly, on November 10, 2008, the trial judge sentenced the petitioner to a term of 15 years to life in prison.

### *The petitioner's Direct Appeal*

On September 28, 2009, the petitioner filed a Petition for Appeal in the Supreme Court of Appeals of West Virginia (the "SCAWV"), asserting the following assignments of error:

A. The crime of murder as committed through Felony Murder as reasoning for seeking and subsequently obtaining a conviction against the Appellant is violation of the United States Constitution and the Constitution of the State of West Virginia.

B. The lower tribunal erred in allowing previously suppressed evidence to be presented before the trier of fact in the trial of the Appellant.

C. The lower tribunal erred by allowing State's Exhibit #1 to be introduced into evidence, which was irrelevant and unfairly prejudiced the Appellant.

D. The lower tribunal erred by allowing the State of West Virginia to use audio tape to refresh the recollection of one of its witnesses in the presence of the jury without providing an instruction to the jury.

E. The lower tribunal unfairly prejudiced the Appellant by allowing the State of West Virginia to present bad character evidence of the Appellant before the trier of fact.

F. The lower tribunal erred by allowing a witness to be called as a rebuttal witness, who basically re-testified, after that witness was permitted to remain in the Court room the entire time of the trial.

G.     The lower tribunal erred when it failed to give an instruction pertaining to "entering without breaking" to the trier of fact.

H.     The State of West Virginia was allowed to unfairly prejudice the Appellant when the lower tribunal allowed the State of West Virginia to define "breaking" in its closing argument.

I.     The lower tribunal prevented the Appellant to counter the State of West Virginia's unfair definition of "breaking" when it sustained an objection made by the State of West Virginia during the Appellant's closing argument.

J.     The lower tribunal erred in failing to grant the Appellant's motion for a change of venue.

K.     The lower tribunal erred in failing to grant the Appellant's oral motion for judgment of acquittal upon the State of West Virginia's completion of their presentation of evidence at trial.

L.     The Appellant was convicted of murder in the first degree based upon felony murder theory; however, the Appellant did not commit one of the enumerated felonies which is set forth by statute.

M.     The lower tribunal erred in failing to grant the Appellant's motion for a new trial.

N.     Through cumulative error the Appellant was unfairly prejudiced in the trial conducted in the lower tribunal.

(*State v. Roberts,* Case No. 091481) (ECF No. 12, Ex. 2).  By order entered on October 29, 2009, the SCAWV granted the petitioner's motion for leave to file petition for appeal out of time, and accepted the petitioner's Petition for Appeal.  (*Id.*, Ex. 3).  On November 24, 2009, the SCAWV deferred ruling on the petitioner's Petition for Appeal pending a response from the State.  (*Id.*)  The State's Response to the Petition for Appeal was filed on December 15, 2009.  (*Id.*, Ex. 4).  On January 28, 2010, the SCAWV refused the petitioner's Petition for Appeal.  (*Id.*, Ex. 5).  The petitioner did not file a Petition for a Writ of Certiorari in the Supreme Court of the United States.

## *The petitioner's Circuit Court Habeas Corpus Petition*

On August 16, 2010, the petitioner filed a *pro se* Petition for a Writ of Habeas Corpus in the Circuit Court of Fayette County (Case No. 10-C-419), which raised the following grounds for relief:

1.      Petitioner was denied due process of law as secured by the 5th, 6th and 14th Amendments to the U.S. Constitution when there is insufficient evidence to support a conviction for felony murder predicated on an attempt to commit breaking and entering.

2.      Petitioner [was] denied due process of law as secured by the 5th, 6th and 14th Amendments to the Constitution of the U.S.A. when petitioner was denied his right to a unanimous verdict.

3.      The State's use of an attempt to commit a breaking and entering as the predicate offense for invoking the felony murder doctrine under W. Va. Code § 61-2-1 (1991 c. 38) where the defendant did not kill the victim  violates the U.S. Constitution, Amendment VIII, and international norms.

4.      Petitioner was denied due process of law as secured by the 5th, 6th and 14th Amendments to the Constitution of the U.S.A. when the State alleged and prosecuted petitioner for attempting breaking and entering on public land.

5.      Petitioner was denied meaningful and effective assistance of counsel as secured by the U.S. Constitution, 1st, 5th, 6th, 8th, and 14th Amendments.

6.      Petitioner was denied due process of law as secured by the 5th, 6th and 14th Amendments to the Constitution of the U.S.A. when the evidence presented by the State of W. Va. in their case in chief failed to establish commission of a predicate offense which may serve as the underlying offense to prove felony murder.

7.      Petitioner was denied due process of law as secured by the 5th, 6th and 14th Amendments to the Constitution of the U.S.A. when the evidence presented by the State of W. Va. in their case in chief failed to establish commission of the predicate offense of robbery which the State contended was an alternative means of proving Murder in the First Degree.

(ECF No. 25, Ex. 1).

On April 29, 2011, the petitioner, by counsel, Ward Morgan, filed an Amended Petition for Writ of Habeas Corpus in the Circuit Court of Mercer County.  (ECF No. 25, Ex. 2).  In addition to the issues raised in the petitioner's initial petition, the Amended Petition states that the petitioner was basing his claims for relief on the following grounds:

1)     Whether a sufficient factual basis was established to prove the underlying conviction of attempted breaking and entering which was the predicate offense for felony murder.

2)     Whether the trial court erred in admitting Petitioner's January 17, 2008 statements after nearly a full day of interrogation.

3)     Whether authorities violated the Prompt Presentment Rules in keeping Mr. Roberts in custody for more than 14 hours before he was arraigned before a magistrate.  He was arrested on January 17, 2008 at around 10 a.m. but was not taken before the magistrate for arraignment until the early morning hours of Friday, January 18, 2008?

4)     Whether defense counsel was ineffective in permitting Mr. Roberts to give a final statement to authorities?

(*Id.*)

On June 6, 2012, the Honorable William J. Sadler, Circuit Judge, issued an "Opinion Order Denying Petition for Writ of Habeas Corpus" (hereinafter "Order Denying Habeas Petition") (ECF No. 12, Ex. 11).

### *The petitioner's Habeas Corpus Appeal*

On November 19, 2012, the petitioner, by counsel, Ward Morgan, filed a Petition for Appeal concerning the denial of his habeas petition (*State ex rel. Roberts v. Ballard*, Case No. 12-0782) (ECF No. 12, Ex. 6).  The Petition for Appeal raised a single ground for relief:  "The trial court abused its discretion by finding Petitioner's trial counsel

effective when they failed to raise the issue of his mental retardation in their Motion to Suppress his statement of January 17, 2008." (*Id.*)

On May 24, 2013, the SCAWV issued a Memorandum Decision affirming Judge Sadler's Order Denying Habeas Petition in Case No. 10-C-419). The undersigned will address the SCAWV's findings *infra*, as necessary.

<u>The petitioner's Section 2254 Petition</u>

On September 19, 2013, the petitioner filed the instant section 2254 petition (ECF No. 1) and a Memorandum in Support (ECF No. 2)[1], raising the following grounds for relief:

1. Petitioner was denied due process of law as secured by the 5th, 6th and 14th Amendments to the U.S. Constitution when the evidence presented by the State of W. Va. in their case in chief failed to establish that Mr. Losey Lee Bennett, Sr., was killed during the commission of a robbery.

   (a) The victim's death resulted from removal from life support.

   (b) The indictment did not charge felony murder.

   (c) The jury was erroneously charged on larceny and first degree robbery.

   (d) There was insufficient evidence to establish the commission of a robbery.

   (e) There were more specific statutes under which the petitioner could have been charged; petitioner's counsel was ineffective for failing to request jury instructions under those statutes.[2]

_____

[1]  The petitioner's Memorandum in Support largely repeats or expands upon the arguments made in the section 2254 petition itself. Thus, unless the undersigned refers specifically to something contained only in the Memorandum in Support, the undersigned will only cite to the section 2254 petition.

[2]  The section 2254 petition does not break the petitioner's arguments in each ground for relief into enumerated subsections. These subsections were enumerated by the respondent in his Memorandum of Law in support of his Motion for Summary Judgment (ECF No. 13). In the petitioner's initial Reply to the Motion for Summary Judgment (ECF No. 20), he transposes the sections that the respondent referred to as sections 1(d) and 1(e) in his Memorandum of Law. Because this Proposed Findings and Recommendation is addressing the respondent's Motion for Summary Judgment, for ease of reference,

2.      Petitioner was denied due process of law as secured by the 5th, 6th and 14th Amendments to the U.S. Constitution when the evidence presented by the State of W. Va. in their case in chief failed to establish that Mr. Losey Lee Bennett, Sr., was killed by the petitioner or one of his associates during the commission of a breaking and entering.

    (a)      The victim's death resulted from removal from life support.

    (b)      There was no evidence of breaking because the petitioner had a key and permission to enter the building.

    (c)      There was no evidence of intent because no property was removed.

3.      Petitioner was denied meaningful and effective assistance of counsel as secured by the First, Sixth, Eighth and Fourteenth Amendments to the Constitution of the U.S.A. by the acts of commission and the acts of omission of Defense Counsel, Jason R. Grubb and Michael P. Cooke.

    (a)      Defense counsel failed to challenge the applicability of the felony murder rule.

    (b)      Defense counsel should have filed a petition for a writ of prohibition to prohibit the State from proceeding on a felony murder theory.

    (c)      Defense counsel failed to challenge the indictment based upon the fact that the building was not a dwelling and the jury was mis-instructed on this point.

    (d)      Defense counsel failed to challenge the petitioner's sentence based upon the fact that the statute requires incarceration in the "penitentiary" which is closed.

    (e)      Defense counsel did not discuss the indictment with the petitioner.

    (f)      Appellate counsel filed an untimely appeal.

4.      The state courts denied petitioner a fair and impartial jury trial as secured by the Sixth Amendment to the Constitution of the U.S.A. when the trial court overruled defense counsel's contention that the

---

the undersigned will address the petitioner's claims using the same subsections that the respondent used in his Memorandum of Law.

meaning of breaking was a question of fact for the jury and the Court adopted the State's position that the definition of breaking was a question of law for the court.

5.   Petitioner was denied a fair and impartial jury trial as secured by the Sixth Amendment to the U.S. Constitution when the trial court denied Defendant's Motion for a Change of Venue.

(ECF No. 1).

On January 3, 2014, the respondent filed a Response to the section 2254 petition (ECF No. 11), a Motion for Summary Judgment (ECF No. 12), with accompanying exhibits, and a Memorandum of Law in support thereof (ECF No. 13). On February 19, 2014, prior to the issuance of a *Roseboro* notice, the petitioner filed a "Reply to Respondent's Motion for Summary Judgment" (ECF No. 20). The petitioner's 35–page Reply comprehensively addresses each of the petitioner's claims for relief and the respondent's arguments made in his Motion for Summary Judgment. Nevertheless, on October 10, 2013, as required by the holding in *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the undersigned notified the petitioner of his right and obligation to file a response to the respondent's Motion for Summary Judgment and the procedures for responding to such a motion, and set deadlines for an additional response by the petitioner and a reply by the respondent. (ECF No. 22).

On May 29, 2014, the petitioner filed a "Supplemental Reply" (ECF No. 23). The respondent did not file any additional briefing. This matter is ripe for adjudication.

## STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), which was adopted as part of the Anti-terrorism and Effective Death Penalty Act of 1996 (the "AEDPA") provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect

8

to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000), the Supreme Court held that under the "contrary to" clause, a federal court may grant a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) if the state court decides a case differently from the Supreme Court on a set of materially indistinguishable facts. The Court further held that under the "unreasonable application" test, a federal court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court only if the state court identifies the correct governing principle from the Supreme Court's decision, but unreasonably applies that principle to the facts of the prisoner's case. *Id.* at 413.

Moreover, the AEDPA contains a presumption that a state court's factual findings are correct:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Rule 56 of the Federal Rules of Civil Procedure applies to habeas corpus proceedings. *See*, *e.g.*, *Blackledge v. Allison*, 431 U.S. 63, 81 (1977); *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991). Entry of summary judgment is appropriate when there is "'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Rule 56(c), Fed. R. Civ. P.).

## FACTUAL BACKGROUND AND RELEVANT TESTIMONY

On September 19, 2007, Losey Lee Bennett ("Bennett") was working as a contract employee at Pinnacle Rock State Park in Mercer County, West Virginia. Benny Ray Roberts (hereinafter "the petitioner") was also working at Pinnacle Rock State Park as part of a "Community Welfare Employment" program through the West Virginia Department of Health and Human Resources. Both men had been working with other park employees on a project to run an underground electrical line up to a building at the top of the hill.

After the park had closed and the other workers had left for the day, Bennett remained at the park to continue operating a piece of excavating equipment on the project. At some point, he was assaulted and sustained severe injuries to his head. The following morning, his body was discovered some distance away from the machinery he was operating, which was still running. A 2x4 wooden board was found near the piece of equipment.

Bennett was taken to Bluefield Regional Medical Center and subsequently transferred to a Roanoke, Virginia hospital, where he was placed on life support. On September 25, 2007, Bennett's wife elected to discontinue the life support and he died.

### A.      The State's Case in Chief.

The West Virginia State Police began a murder investigation, led by Sgt. Michael Smith ("Smith"), and attempted to locate all of the employees of Pinnacle Rock State Park to take statements concerning their knowledge of the events and circumstances surrounding Bennett's death.  The petitioner was the last employee Smith was able to locate.  (ECF N0. 12, Ex. 9 at 2-3).

Smith testified that he went to the petitioner's house on January 8, 2008, but the petitioner was not at home, so Smith asked his daughter to have the petitioner contact him.  The petitioner later contacted Smith and made arrangements to come to the Princeton State Police detachment to give a statement.  Over the course of the following month, the petitioner made a number of statements[3] concerning his knowledge of the events and circumstances surrounding Bennett's death which were inconsistent in nature.  Each statement became more incriminating for the petitioner.  The following summary of the statements is derived from the trial transcript in which each statement or interview was transcribed as it was played for the jury during the trial.  (ECF No. 12, Ex. 19, *passim*).

*January 9, 2008 Statement (ECF No. 12, Ex. 19 at 198)*

In the petitioner's first statement, which was given on January 9, 2008 to Sgt. Smith, and was not recorded, he claimed that he left work early to take his daughter to a doctor's appointment and did not know anything about what happened to Bennett.  The petitioner's supervisor, Robert Ratcliff, subsequently told Smith about an odd conversation he had with the petitioner, in which the petitioner referred to what

---

[3]  It appears that a total of eight statements, including two polygraph examinations, were taken from the petitioner.  The undersigned will only address the statements which were introduced at trial.

happened to Bennett as an accident, which made Ratcliff suspicious of the petitioner. Ratcliff also pointed out some other factual discrepancies in the petitioner's statement to Smith.  Thus, Smith decided to call the petitioner in to make a second statement on January 15, 2008.

<u>First January 15, 2008 Statement (ECF No. 12, Ex, 19 at 206-255)</u>

In the second statement, which was taken by Sgt. Smith and Sgt. Gary Tincher, the petitioner contended that, on their way home from the doctor's office, he and his daughter stopped at the lake at Pinnacle Rock State Park so he could pick up some trash that had not been removed before he left the park earlier that day.  The petitioner stated that he and his daughter then went to retrieve more garbage bags at the main area of the park.

The petitioner further stated that, when they pulled into the main parking lot, they saw some men who were not supposed to be in the park, one of whom was a fellow employee named Joe Marrah (or O'Marrah).  The petitioner further stated that one of the men was lying on the ground and another was holding a board that looked like it was off of a picnic table (which he initially called a stick).  The petitioner further stated that when the man on the ground moved, "you could see hair and blood."  The petitioner stated that he and his daughter were scared so they quickly left the parking lot, and he did not report this event to anybody because Joe O'Marrah subsequently threatened him and he was scared.  The petitioner further stated that, after this event, O'Marrah also talked about having some money that he did not previously have.

Smith also interviewed the petitioner's daughter whose statement, to some extent, corroborated the petitioner's story.  However, Smith still had some concerns that the petitioner was not being fully truthful.  Thus, the petitioner came back to the State

Police detachment later that night and gave another recorded statement. The petitioner admitted that he had made some false statements in his prior accounts concerning the events on September 19, 2007.

### *Second January 15, 2008 Statement (ECF No. 12, Ex. 19 at 263-336)*

In this third statement, which was also taken by Sgts. Smith and Tincher, the petitioner admitted that he had previously made some false statements concerning the Bennett incident. He stated that, at some time prior to Bennett's assault, the petitioner had been drinking with two men named Ernie Graham and Robert (Bobby) Mullins, and that Graham was upset with Frank Ratcliff, the Park Superintendent, because he had written Graham a bunch of tickets, and Graham wanted to "whip him." Thus, the petitioner told the State Police that Graham and Mullins were asking him about Ratcliff's work schedule. The petitioner further stated that, the next thing he knew, Mullins showed up at the park and was talking to Joe O'Marrah. The petitioner further stated that, after his conversation with O'Marrah, Mullins told the petitioner that Graham was supposed to meet him at the park that day, but he did not show up.

The petitioner further stated that, two days later, on Wednesday, September 19, 2007, he left early to take his daughter to the doctor, and they stopped at the park, after getting gas, to pick up garbage bags. The petitioner stated that, when he drove his car up to the headquarters building and got the trash bags, Bobby Mullins yelled at him from just above the excavating equipment being used for the electrical project. The petitioner further stated that, at that point, Ernie Graham came out from behind some trees, holding a wooden board. The petitioner said both Graham and Mullins had blood on them. The petitioner further stated that there was also a man on the ground covered in blood, but he could not immediately identify the man because his head was turned.

13

The petitioner further stated that Graham told him that it wasn't Frank Ratcliff and, at that point, he knew it was Bennett.  The petitioner further stated that Graham told him to get out of there, so he ran to his truck and drove away and, as he left, he recognized a dark blue Mercedes Benz, which he had previously seen at Mullins' house.

The petitioner said his daughter told him to call Frank Ratcliff, but Ratcliff did not answer and he did not leave a message; nor did he call the police or rescue squad because he was afraid he'd be in trouble.  The petitioner denied having any involvement in this incident.

The petitioner further stated that, although he was not scheduled to work, the next morning, he went up to the park because he was scared and wanted to see if the police knew anything about who had done it.  The petitioner further stated that the following evening, Graham and Mullins were across the road at a friend's house and they came over and threatened to kill him if he said anything.  He also stated that Graham pulled out a sawed-off shotgun.  Then, sometime around Thanksgiving, the petitioner stated that he saw Mullins again in the trailer park, but did not speak with him.  However, later that night, the petitioner's car was stolen and Graham and Mullins were stopped by the police in the petitioner's car with a sawed-off shotgun.

At the conclusion of this statement by the petitioner, Sgt. Tincher showed the petitioner a picture, which the petitioner identified as the man he knew to be Bobby Mullins.  In fact, the picture was of a man named Robert J. Mills, and Mills was incarcerated in the State of Virginia on September 19, 2007, and could not have been involved in the assault and death of Bennett.  (ECF No. 12, Ex. 19 at 340-342).  Thus, the State Police again knew that the petitioner was not telling the truth.  So, on January 17,

2008, the petitioner was brought back to the State Police detachment to give another statement.

### *First January 17, 2008 Statement (ECF No. 12, Ex. 19 at 348-443)*

In this fourth statement, which was also taken by Sgts. Smith and Tincher, the petitioner repeated his story about taking his daughter to the doctor, but now contended that he took her home before going back to the park.  The petitioner stated that Ernie Graham called him around 5:00 p.m., and the petitioner agreed to go to the park to unlock a tool shed, using a key he possessed, so that Graham could steal power tools and sell them.  The petitioner further stated that Graham told him he would give him something for doing this, but never did.

The petitioner further stated that, when he arrived at the parking lot, he saw Graham's mother's car, a cream colored Ford Escort.  He said he also saw that Bennett was still there running the excavator.  Then, the plaintiff stated that he saw Graham and another man, who he referred to as "John Paul."  He stated that Graham had a wooden board and that he hit Bennett in the head with it.  The petitioner stated that there was no way that Bennett could have seen them because they were behind him.

The petitioner further stated that Graham attempted to hit Bennett again, but missed him and hit the equipment, and then John Paul pulled Bennett off of the equipment onto the ground.  He further stated that Graham hit Bennett again, and John Paul was kicking him, and that Bennett was still conscious and yelling for help.  The petitioner denied having any plan with Graham to attack Bennett, claiming, "All I was supposed to do was unlock the tools.  And I mean, the place where all the power tools.  Yes, sir.  I did do that."  (ECF No. 12, Ex. 19 at 376).

However, the petitioner further stated that Graham and John Paul ordered the petitioner to help them carry Bennett up to the top of the hill, but the petitioner could not because he has pins in his legs.  When they got to the top of the hill, John Paul allegedly kicked Bennett in the side of the face again.  The petitioner also stated that they took Bennett's wallet and his credit cards, but they did not break into the shed or steal any tools because they couldn't get up there to unlock it.  Instead, the petitioner got in his car and left, with the others right behind him.

The petitioner told the State Police investigators that Graham took the credit cards, but they couldn't use them.  The petitioner again stated that Graham, who subsequently dated the petitioner's sister, threatened him to keep his mouth shut.  He said he never saw John Paul again.

The petitioner also reconfirmed that Graham and Bobby Mills were arrested for stealing his car around Thanksgiving of 2007.  The petitioner confirmed that he had lied in his previous statements concerning the events surrounding the attack on Bennett.  He confirmed that his daughter was not with him, which also indicated that she had lied for him when she was questioned by the State Police.

### *Second January 17, 2008 Statement (ECF No. 12, Ex. 19 at 531-630)*

The petitioner gave a second statement on January 17, 2008 (his fifth overall, excluding the polygraph examinations).[4]  The petitioner reconfirmed that he and Graham made an agreement to steal equipment from the tool shed at Pinnacle Rock

---

[4]  In between the two statements given by the petitioner on January 17, 2008, the petitioner agreed to assist the State Police investigators in trying to obtain a statement or confession from Ernie Graham via an audio recorded telephone call.  (ECF No. 12, Ex. 19 at 519-526).  Sgt. Jose Centeno was involved in this process, to facilitate the electronic surveillance process.  However, although the petitioner and Graham apparently engaged in a short conversation, Graham refused to discuss the matter over the phone and did not provide any useful information.  (*Id.*)  When they returned to the station, the petitioner agreed to continue speaking with Sgt. Centeno about the matter, which resulted in his fifth statement, which was taken by Sg. Centeno, Sgt. M.R. Crowder, and Senior Trooper Brad Burner.

State Park.  The petitioner further stated that Frank Ratcliff had previously let the petitioner take home a lawnmower to repair and use at his house.  The petitioner further stated that he had agreed to meet Graham at the park on September 19, 2007, and that the petitioner arrived there between 5:30 and 6:00 p.m.  The petitioner repeated his story about seeing Graham and John Paul hiding in the trees while Bennett was still running the excavator.  However, this time, the petitioner stated that Bennett saw the petitioner just before Graham struck him with the board.  The petitioner confirmed that Bennett was still alive and conscious and begging for help.  The petitioner also admitted that he helped carry Bennett up to the top of the hill.

In this statement, the petitioner added the fact that Graham gave the petitioner one of the credit cards that was taken from Bennett's wallet.  The petitioner stated that he attempted to use the card at the ATM at the Arrow Head Deli, but it didn't work, and then he tried to buy beer with it, but was also unsuccessful because he did not know the PIN number.  At that point, the petitioner stated that he was scared and went back to his house.  He said he gave the credit card back to Graham.  He further stated that he threw the wallet away in a garbage can at the Arrow Head Deli.  The petitioner again confirmed that they did not get the chance to open the shed and steal any equipment or tools.  The petitioner reconfirmed that Bennett saw him just before he was struck with the board.  He said, "Yeah, he looked dead at me.  Well, he turned his head and looked right at me."  (ECF No. 12, Ex. 19 at 584).

The majority of the State's case in chief consisted of the presentation of the petitioner's inconsistent statements through the testimony of the investigating officers. The State also called Robert Ratcliff, who testified about the petitioner's employment at Pinnacle Rock State Park and the project on they were working on September 19, 2007,

17

and about finding Bennett's body at the park on the morning of September 20, 2007. (ECF No. 12, Ex. 19 at 143-166). Ratcliff also unequivocally testified that, unless so scheduled, the petitioner, and other park employees, had no permission or authority to enter park buildings after work hours. (*Id.* at 166-167).

The State also presented the testimony of the State Medical Examiner who confirmed that Bennett sustained head injuries from blunt force trauma, consistent with the blows that the petitioner said were struck by Graham and John Paul. The Medical Examiner's testimony did not reveal any evidence concerning the perpetrator(s) of the crime. (*Id.* at 505-516).

The petitioner's daughter, Roseanne Roberts, testified at trial, and admitted that she had lied when she gave her statement to the State Police. The recorded statement was played for the jury. Roseanne Roberts testified that she was not up at Pinnacle Rick State Park with her father as described in her statement, but stated that she told the investigators that her father asked her to tell that story because they threatened to arrest her. (*Id.* at 656-678).

### B. Motion for Judgment of Acquittal.

At the conclusion of the State's case in chief, the petitioner's counsel moved for a judgment of acquittal on the basis that the State had not proven felony murder because there was no evidence to show that a breaking and entering or robbery had occurred. The defense argued that, at best, the evidence in the light most favorable to the State might show that the petitioner attempted an entering without breaking, or that the petitioner was an accessory after the fact to a robbery. (ECF No. 12, Ex. 19 at 683-684). The defense contended that neither of those offenses are enumerated offenses in the murder statute sufficient to support a conviction for felony murder. (*Id.* at 685).

The trial court found that the evidence was sufficient for a jury to find that the petitioner was attempting a breaking and entering in the course of which Mr. Bennett's death ensued.  The court relied upon the common law definition of "breaking" to mean "an unauthorized entry of a building."  (*Id.* at 688-689).  The trial court also found that there was sufficient evidence for a jury to consider whether the petitioner was involved in a robbery, in light of the evidence that the victim's wallet and credit cards were taken from his person as he was violently beaten.  (*Id.* at 690-691).  Thus, the court denied the motion for judgment of acquittal.  (*Id.* at 691).

### C.    The Defense's Case.

The petitioner presented the testimony of his wife, son, son-in-law, and a friend of the petitioner's son, who attempted to demonstrate that the petitioner's statements to law enforcement were coerced by force used against the petitioner while he was being questioned at the State Police detachment.  (ECF No. 12, Ex. 19 at 696-738).  Prior to trial, the trial court conducted a hearing on a motion to suppress the petitioner's statements and found that all of the statements used at trial were voluntary and admissible.  (ECF No. 12, Ex. 9).

The petitioner also presented the testimony of Melvin "Ernie" Graham, who denied having any involvement in the Bennett assault and denied having an agreement with the petitioner to steal anything from Pinnacle Rock State Park.  (ECF No. 12, Ex. 19 at 756-757, 767).  Graham testified that he was working construction in Athens, West Virginia on September 19, 2007.  (*Id.* at 753-755).  Graham also testified that, when he was arrested in the petitioner's car, Bobby Mills had told him that he borrowed it from the petitioner.  (*Id.* at 757-758).  Graham also admitted to showing the petitioner a shotgun that he said his brother used for hunting, and stated that he had it in the

19

petitioner's car that night because the car he had been driving broke down and he took it out of that car when Bobby Mills picked him up.  (*Id.* at 760-761).

The petitioner also testified at the trial.  The petitioner stated that Graham had approached him about stealing some stuff from Pinnacle Rock State Park.  (*Id.* at 785).  He further stated that, on September 19, 2007, he left work around 2:00 p.m. to take his daughter to the doctor.  (*Id.* at 788-789).  The petitioner stated that, when they left the doctor's office, he went home and drank beer and watched television until around 6:30 p.m., when he was supposed to meet Graham and another man at the park to unlock the tool shed so they could steal some equipment.  (*Id.* at 789-790).  The petitioner further testified about the various locations the keys that he possessed would allow him to open and that he had previously been permitted to borrow a lawnmower from the park to repair and use at home.  (*Id.* at 794).

Because the petitioner had told Graham that park workers were usually gone by 4:00 p.m., they were not expecting anyone to be at the park.  The petitioner testified that, when he pulled into the parking lot, he saw Graham standing over by the excavator, which was near the bottom of the hill, with a board in his hand.  (*Id.* at 796-797).  The petitioner further testified that he walked up and asked Graham what was going on.  It is unclear whether, at that time, Graham had already struck Bennett.  (*Id.* at 797-798).  The petitioner stated that he saw Graham swing the board and he told Graham he didn't want to be a part of hurting anyone.  (*Id.* at 798-799).  The petitioner denied helping them move Bennett's body and stated that he was scared and left immediately.  (*Id.* at 799-801).  The petitioner attempted to justify the differences in his final statements to the police from his trial testimony by claiming that the police had used force against him to change his story.  (*Id.* at 801).

20

The petitioner again stated that he tried to call Frank Ratcliff, but got no answer, and did not contact authorities because he was scared.  The petitioner denied taking any credit cards from Bennett and claimed that he went home and drank more beer with his daughter's boyfriend.  (*Id.* at 801-803).  The petitioner admitted that he did nothing to try to help Bennett who was still alive at that time.  (*Id.* at 803).

The petitioner further testified that he had no reason to believe that Graham and the other man were going to rob Bennett because Bennett was not supposed to be there in the first place.  (*Id.* at 804).  The petitioner further stated that he lied in his prior statements to the police because he was scared of going to prison and was scared of Graham, who had threatened to kill him.  (*Id.* at 808).  At trial, he further stated that he didn't remember much of what he had previously told the police.  (*Id.* at 808-812; 827-835).  The petitioner claimed that some of the investigating officers beat him and threatened him by placing a gun in his mouth while he was the State Police detachment for questioning for hours on end.  (*Id.* at 827-838).

On cross-examination, over the petitioner's objection, the prosecutor was permitted to ask the petitioner about another statement he had made to a Corporal James Long on the way back from his arraignment in Princeton.  (*Id.* at 843-846; 848-852). This statement had previously been found to be inadmissible because the petitioner made it after his right to counsel had attached.  However, because the petitioner had testified, the State was allowed to impeach him with the details of this prior inconsistent statement in which the petitioner told Corporal Long that he and the other two men who were there that night knew they "were had" because Bennett recognized the petitioner.  (*Id.* at 850-851).  The petitioner again stated that he did not remember that conversation.  (*Id.* at 851).

21

The petitioner was also cross-examined about a time when he was reprimanded by Frank Ratcliff for taking gas from the park shed for his truck.  (*Id.* at 852-854).  The petitioner was also asked about an additional statement he had made to the police on February 12, 2008, in the presence of his attorney, in which the petitioner admitted that Bennett's death was caused by Graham, who had planned with the petitioner to steal stuff from the shed.  (*Id.* at 856).  The State emphasized that the February 12, 2008 statement was largely similar to that of the statements he had given on January 17, 2008, when he claims he was coerced by authorities.  (*Id.* at 855).

On redirect, the petitioner's counsel tried to establish that the petitioner suffered a head injury when he was a young child and that it affected his ability to remember things.  (*Id.* at 860).  The defense also emphasized that, although the petitioner admitted that he went over to the park to unlock the shed for Graham, they never got to open it, and nothing was taken.  The petitioner again stated that he left as soon as he saw them beating Bennett.  (*Id.* at 863).  The defense also offered the testimony of several other witnesses, Ronald Pennington and Robin Tripp, who testified that Graham admitted to them that he had beaten Bennett and taken his wallet.  (*Id.* at 880-891).

**D.**      **The State's Rebuttal.**

In rebuttal, the State offered the testimony of Sgt. Michael Crowder, who testified that he did not witness any threats or force used against the petitioner, or any evidence thereof while he was at the State Police detachment for questioning.  (*Id.* at 892-895).  The State also recalled Frank Ratcliff and asked him whether there was any evidence that he had received a phone call from the petitioner on the night of September 19, 2007.  Ratcliff stated that there was no missed call on his caller ID.  (*Id.* at 898-904).

22

Ratcliff was also questioned about the prior incident in which the petitioner was reprimanded for taking gas from the park shed. (*Id.* at 901-902).

The State also called Mercer County Magistrate Rick Fowler who presided over the petitioner's arraignment after his arrest in the early morning hours of January 18, 2008. Magistrate Fowler testified that he did not see any evidence that the petitioner had been beaten. (*Id.* at 907-909). On cross-examination, Fowler admitted that he could not see the petitioner's ribs or other parts of his body that were covered by clothing. (*Id.* at 910-911).

Finally, the State called Corporal James Long who briefly testified about the statement the petitioner made on the trip back from his arraignment. Long testified:

> He stated that when he and his two alleged conspirators pulled up to the Park, the victim actually saw them and they knew him. And he made the statement that they were already made. He told the other two subjects that we're made. We're caught or something to that effect. And he made the statement that the other two subjects physically attacked the victim and he said from there there's no turning back.

(*Id.* at 916). Long admitted that the petitioner did not implicate himself in striking Bennett. (*Id.* at 917).

### E.    Other Testimony.

An omnibus hearing was held on the petitioner's Petition for a Writ of Habeas Corpus in the Circuit Court of Mercer County on March 2, 2012. (ECF No. 21). During that hearing, testimony was taken from Sgt. Michael Smith, Sgt. Michael Crowder, Corporal B.S. Burner, the petitioner's trial and appellate counsel, Michael Cooke and Jason Grubb, and the petitioner. The majority of the testimony at the omnibus hearing concerned the petitioner's mental competency and whether his statements to police were knowing and voluntary. During the petitioner's testimony, he admitted that he

had an agreement with Ernie Graham to unlock the tool shed at the park; however, his testimony also revealed, for the first time in the proceedings, that the petitioner was apparently not in possession of the key to unlock the tool shed on the night in question. (ECF No. 12, Ex. 21 at 104).  The undersigned will refer to this testimony as necessary *infra.*

## ANALYSIS

### A.     Exhaustion of state court remedies.

The respondent's Motion for Summary Judgment (ECF No. 12) and Memorandum of Law in support thereof (ECF No. 13) assert that the majority of the petitioner's grounds for habeas corpus relief contained in his section 2254 petition are unexhausted and/or procedurally defaulted, either because they were not raised in his Circuit Court habeas petition, upon which he had an omnibus hearing, and was instructed that he was required to raise all of his claims in that proceeding or else they would be waived, or because he did not raise all of his habeas claims in his habeas corpus appeal.  In particular, the respondent contends that Grounds 1(a), (b), (c), and (d), Ground 2(a), (b) and (c), Ground 3(a), (b), (c) [in part], (d), (e), and (f), Ground 4 and Ground 5(c) are not exhausted and, thus, are procedurally defaulted.  As a result of the petitioner's inability to show cause and prejudice or actual innocence to overcome his procedural default, the respondent asserts that these claims are unreviewable in this federal court.  (ECF No. 13 at 7-15).

The petitioner disputes the respondent's contention and, in particular, requests that the court find that all of his claims of ineffective assistance of counsel (contained in Ground 3 of the section 2254 petition) are reviewable under the exception created in *Martinez v. Ryan*, 132 S. Ct. 1301 (2013).  (ECF No. 20, *passim*).  In *Martinez*, the

Supreme Court held that, although ineffective assistance of habeas counsel, in and of itself, is not a cognizable claim in federal habeas corpus, inadequate assistance of counsel at initial collateral review (habeas) proceedings <u>may</u> establish cause to overcome a prisoner's procedural default of a claim of ineffective assistance of <u>trial</u> counsel, where ineffective assistance of counsel claims are addressed, by law or by practice, for the first time, on collateral review, rather than direct appeal.  The petitioner contends that the failure of his habeas counsel, Ward Morgan, to raise and exhaust all of the claims of ineffective assistance of trial counsel that he now wishes to pursue in his section 2254 petition should serve as cause to excuse any procedural default of those claims.

However, the Supreme Court's decision in *Martinez* does not automatically render such claims reviewable in federal court, as suggested by the petitioner in his response.  Rather, the petitioner must establish that his state habeas counsel was, indeed, ineffective in failing to raise such claims.  The petitioner must demonstrate that the underlying claims of ineffective assistance of trial counsel were <u>substantial</u> (that is, that they have "some merit"), and that the petitioner was prejudiced by the failure to have the claims addressed in the state courts.

The undersigned proposes, however, that the presiding District Judge **FIND** that an extensive analysis of the exhaustion of state court remedies concerning the petitioner's grounds for relief, including the applicability of the *Martinez* decision to the petitioner's claims of ineffective assistance of counsel, is unnecessary because, pursuant to 28 U.S.C. § 2254(b)(2), "an application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."  28 U.S.C. § 2254(b)(2).  As will be discussed in

detail *infra*, the undersigned proposes that the presiding District Judge **FIND** that each of the petitioner's claims for habeas corpus relief under 28 U.S.C. § 2254 lack merit and that the respondent is entitled to judgment as a matter of law on each of the petitioner's claims.

### B.   The petitioner's due process claims related to sufficiency of the indictment and sufficiency of evidence.

In Grounds One and Two of his federal petition, the petitioner alleges that his conviction for felony murder violated his right to due process of law because the State could not prove that the victim died during the commission of either a robbery or breaking and entering.  The petitioner makes various contentions in support of his due process challenges.  The undersigned will address each one in turn.

### *The victim was removed from life support*

First, in Grounds 1(a) and 2(a) of his federal petition, the petitioner contends that he was improperly convicted of felony murder because the victim's death was not due to any act of the petitioner, and resulted from the victim being removed from life support some days later, not during the events surrounding the petitioner's criminal charges.  Therefore, the petitioner asserts that the victim did not die during the commission of either a robbery or a breaking and entering.

The respondent's Memorandum of Law cites the well-established standard for sufficiency of evidence set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), and more recently discussed in *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012):  "evidence is sufficient to support a conviction whenever, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  The respondent further

asserts that "for a federal habeas court reviewing a State court conviction, 'the only question under *Jackson* is whether that finding was so unsupportable as to fall below the threshold of bare rationality.'"  *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012) (per curiam).  (ECF No. 13 at 15).

The respondent's Memorandum of Law then addresses the essential elements of felony murder in West Virginia.  "The elements which the State is required to prove to obtain a conviction of felony murder are:  (1) the commission of, or attempt to commit, one or more of the enumerated felonies; (2) the defendant's participation in such commission or attempt; and (3) <u>the death of the victim as a result of injuries received during the course of such commission or attempt</u>."  *State v. Williams*, 305 S.E.2d 251, 267 (W. Va. 1983) [Emphasis added].  The respondent then cites to the SCAWV's recent decision in *State v. Jenkins*, 729 S.E.2d 250 (W. Va. 2012), in which the Court upheld a conviction of felony murder where the victim was removed from life support.  The *Jenkins* Court held that "it is sufficient if the initial wound caused the death indirectly through a chain of natural causes."  *Id.* at 262.  The respondent's Memorandum further states:

> *Jenkins*, while only addressing the issue obliquely, does support the proposition that ending life support is "not to be viewed as an independent intentional killing, but rather as a foreseeable consequence of [the victim's] medical treatment[,]  Wayne R. LaFave, *Substantive Criminal Law* § 6.4 (2d ed.), that is, "[w]hen life support is removed, the cause of death is not the removal, but whatever agency generated the need for life support in the first instance."  *State v. Yates*, 824 P.2d 519, 523 (Wash. Ct. App. 1992).

(ECF No. 13 at 16).  *See also, State v. Durham*, 195 S.E.2d 144 (W. Va. 1973) ("It is sufficient if the initial wound caused the death through a chain of natural causes.")

27

To the extent that the SCAWV has not directly addressed this issue, the respondent notes that the Court has, in the past, looked favorably to out of jurisdiction cases for guidance in addressing matters of first impression, and emphasizes that a number of other jurisdictions (19 of which are cited in the respondent's brief) have held that removing a victim from life support does not negate a defendant's culpability for the death (citations omitted).  (*Id.* at 16-17).

The petitioner's Reply (ECF No. 20) takes issue with the respondent's characterization of the *Jenkins* decision.  The Reply asserts that, without a specific holding and rationale, "it is speculation . . . as to whether the [SCAWV] would rule that the removal of a crime victim from life support six (6) days after he was assaulted does not negate a defendant's culpability for the death in a felony murder case where the accused did not inflict a fatal injury."  (*Id.* at 3).  The Reply further contends that, despite the respondent's reliance on the fact that 19 other jurisdictions have found that removal from life support is not an intervening factor that would negate a criminal defendant's culpability for the death, "it is impossible for petitioner to determine if any of these state court decisions addressed a homicide occurring during the commission of a non-violent felony, i.e., entering without breaking a tool shed where the accused did not inflict any of the fatal injuries sustained by the deceased."  (*Id.*)  The petitioner's Reply further states:

> Mr. Bennett was removed from life support during his sixth day of hospitalization.  The cessation of life support is an operative fact giving rise to a right enforceable by this court.  Trial counsel had a duty to investigate this act.  *Strickland v. Washington*, 466 U.S. at 690.  Specifically it was incumbent upon defense counsel to determine, as part of their duty to investigate, whether Mr. Bennett died because he was taken off life support prematurely.  Petitioner believed defense counsel failed to investigate this possibility.

28

> No rationale trier of fact could have found the essential elements of robbery as the predicate offense of felony murder beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). And, therefore this issue has merit. (*Infra*, pp. 8-14).

(ECF No. 20 at 3-4).

Although the petitioner fairly presented issues concerning the sufficiency of his indictment and the evidence for his felony murder conviction based upon either breaking and entering or robbery in his direct appeal and his Circuit Court habeas petition, he did not raise a specific claim based upon the victim's removal from life support in those proceedings. Thus, there is no specific state court decision to review.

The undersigned has been unable to locate any authority in which either the Supreme Court or the United States Court of Appeals for the Fourth Circuit has specifically expressed an opinion on the appropriate standard of review for claims upon which a federal court exercises its discretion under 28 U.S.C. § 2244(b)(2) to review and deny a claim that was not exhausted in the state courts. In *Bell v. Jarvis*, 236 F.3d 149, 158 (4th Cir. 2000), the Fourth Circuit established that, in the situation where a petitioner has raised a cognizable claim, but the state court(s) denied the claim without explanation, an independent, but deferential, review of the record and the applicable law should be made to determine whether the state court's decision (i.e. the "result") was legally or factually unreasonable. However, it stands to reason that where a claim was not addressed at all in the state courts, a *de novo* review would be appropriate. *See Weeks v. Angelone*, 176 F.3d 249, 263 (4th Cir. 1999).

In the instant case, the undersigned proposes that the presiding District Judge **FIND** that, under any standard of review, and applying the clearly-established Supreme Court precedent of *Jackson v. Virginia,* 443 U.S. 307, 319 (1979), any reasonable trier of

fact could have found beyond a reasonable doubt that Bennett's death resulted from the initial injuries he received from the beating on September 19, 2007, and under *Jenkins*, "it is sufficient if the initial wound caused the death indirectly through a chain of natural causes." 729 S.E.2d at 262.

Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the petitioner has not demonstrated a violation of his due process rights on this basis. Therefore, the petitioner is not entitled to habeas corpus relief and that the respondent is entitled to judgment as a matter of law on Grounds 1(a) and 2(a) of the petitioner's section 2254 petition.

*Sufficiency of indictment*

In Ground 1(b), the petitioner also asserts that his due process rights were violated because the indictment did not charge "felony murder." (ECF No. 1 at 4-5). The petitioner challenged the sufficiency of his indictment in a pre-trial motion *in limine*, in his direct appeal, and in his Circuit Court habeas proceeding; he did not, however, raise this issue in his habeas appeal.

The petitioner's section 2254 petition cites to the language of the indictment as follows:

> The Grand Jury charges: that on or about the 19th day of September, 2007, in the County of Mercer, State of West Virginia, BENNY RAY ROBERTS committed the offense of "Murder-First Degree" by feloniously, willfully, maliciously, deliberately, intentionally, and unlawfully did slay, kill, and murder Losey Lee Bennett, against the peace and dignity of the State. *State v. Roberts*, County of Mercer, Indictment No. 08F24 1 WS.

(ECF No. 1 at 4-5). The petitioner asserts that the indictment did not allege that Bennett died during the commission of one of the enumerated felonies, in particular, robbery. The petitioner further contends that the State did not elect to proceed under a felony

murder theory until just before the jury retired to deliberate.  (*Id.* at 5, citing ECF No. 12, Ex. 19 at 686, lines 20-23).[5]

The respondent contends that the petitioner's argument is foreclosed by this court's decision in *Humphrey v. Ballard*, No. 2:08-cr-00879, 2009 WL 2762331, at *6 (S.D. W. Va. Aug. 25, 2009), upon which the state habeas court relied in denying the petitioner's claim for habeas corpus relief.  (ECF No. 13 at 17).  In *Humphrey*, the court found as follows:

> [I]n [*State v. Satterfield*, 193 W. Va. 503; 457 S.E.2d 440 (1995)], the SCAWV found that an indictment like Petitioner's was sufficient under West Virginia law.  As repeatedly noted by Respondent, and as found by the state habeas courts, the indictment need not state the underlying felony that forms the basis of felony murder, or the manner in which the deceased died.  The SCAWV's interpretation of the murder statute is conclusive and binding on the federal court.  *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *Garner v. Louisiana*, 368 U.S. 157, 169 (1961) ("the views of the state's highest court with respect to state law are binding on the federal courts."); *Faircloth v. Finesod*, 938 F.2d 513, 517 n.9 (4th Cir. 1991) ("This court is bound by the state court's interpretation [of a state statute], and must assume that the statute says what the state court says it says.")

2009 WL 2762331, at *8.  On this basis, the respondent contends that the petitioner has failed to show that his conviction violated his federal rights.  (*Id.*)

In his Reply (ECF No. 20), the petitioner contends that the language of his indictment roughly approximates the statutorily required language for murder under W. Va. Code § 62-9-3; however, the petitioner contends that, because his indictment did not contain the word "premeditatedly," it did not properly allege first degree murder, including felony murder.  (*Id.* at 4-5).  The Reply further asserts:

---

[5]   The citation offered by the petitioner is an excerpt from the trial transcript at the point where the defense made its Motion for Judgment of Acquittal (before the defense put on any of its own evidence).  At that time, the trial court confirmed with the prosecuting attorney that the State was only proceeding under the felony murder doctrine.  This, obviously, was well before "the jury retired to deliberate."

> Because defense counsel failed to contest the validity of an indictment that did not allege the murder was committed during the commission of a robbery, and petitioner was convicted of felony murder, petitioner was denied his constitutional rights to due process of law to be fully and plainly informed of the nature, character, and cause of the accusation, U.S. Constitution, 6th and 14th Amendments. Because defense counsel did not contest the validity of an indictment for murder which did not allege the murder was committed during the commission of a breaking and entering, and petitioner was convicted of felony murder, petitioner was denied his constitutional rights to due process of law to be fully and plainly informed of the nature, character, and cause of the accusation, U.S. Constitution, 6th and 14th Amendments.

(ECF No. 20 at 5).

The petitioner further contends that Judge Sadler improperly denied a motion *in limine* to prohibit the State from pursuing a felony murder theory on the basis that the indictment did not contain sufficient language to allege felony murder. (*Id.*) In the Order denying the motion *in limine*, Judge Sadler primarily relied upon the SCAWV's decisions in *State v. Young*, 311 S.E.2d 118 (W. Va. 1983) and *State v. Bragg*, 235 S.E.2d 466 (W. Va. 1977) (antecedent authority to *Satterfield, supra*), which were also cited by Judge Sadler in his Order Denying Habeas Petition. (ECF No. 12, Ex. 9 at 15-16; ECF No. 12, Ex. 11 at 10-13). In *Young*, the appellant challenged his felony murder conviction based upon the fact that the indictment did not mention robbery as the underlying offense, but the court held that "it is not necessary under W. Va. Code § 62-1-1, to set forth the manner or means by which the death of the deceased is caused." 311 S..E.2d at 133-134.

The petitioner's Reply asserts that his indictment is distinguishable from those in the cases relied upon by the respondent and Judge Sadler in his rulings because the petitioner's indictment did not contain the word "premeditatedly." (ECF No. 20 at 5-6). The state habeas court found as follows on this claim:

In this case, the petitioner previously challenged the sufficiency of the indictment twice: once prior to trial and once on appeal.  Prior to trial, Roberts filed a motion *in limine* [footnote omitted] to preclude the State from presenting a theory of felony-murder to the jury.   The defense contended that the indictment was insufficient for felony-murder because the indictment was for "Murder – First Degree," not felony-murder.  In the Order denying Roberts' motion *in limine* [footnote omitted], this Court examined the statutory language in W. Va. Code § 61-2-1 and binding legal precedent promulgated by the West Virginia Supreme Court.   Based thereon, the Court concluded that the indictment contained all essential elements of the crime and sufficiently charged first degree murder by felony murder.   In addition, Petitioner challenged the sufficiency of the indictment after being convicted for first degree murder based on the doctrine of felony-murder.  The West Virginia Court refused the appeal, thereby conclusively disposing of Roberts' challenge to the sufficiency of the indictment.

Hence, the third challenge to the indictment could be outright denied.   However, to be absolutely and comprehensively thorough in assessing the petitioner's constitutional rights, the Court will revisit the issue even though its conclusions remain unchanged.

(ECF No. 12, Ex. 11 at 6-7).  Judge Sadler then addressed in detail the sufficiency of the

petitioner's indictment, relying upon the clearly-established Supreme Court precedent

of *Hamling v. United States*, 418 U.S. 87 (1974), which held that an indictment is

constitutionally sufficient when it:  (1) states the elements of the offense; (2) puts a

defendant on fair notice of the charge against which he or she must defend; and (3)

enables a defendant to assert an acquittal or conviction in order to prevent being placed

twice in jeopardy.  (*Id.* at 7-8).

Judge Sadler's Order Denying Habeas Petition then cites the West Virginia

statutory elements of first degree murder.   West Virginia Code § 62-2-1 provides as

follows:

Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article

four, chapter sixty-a of this code, is murder of the first degree.  All other murder is murder of the second degree.

In an indictment for murder and manslaughter, it shall not be necessary to set forth the manner in which or means by which the death of the deceased was caused, but it shall be sufficient in every such indictment to charge that the defendant did feloniously, willfully, maliciously, deliberately, and unlawfully slay kill and murder the deceased.

W. Va. Code § 62-2-1.  (ECF No. 12, Ex. 11 at 9).  Thus, the state habeas court found that the statute enumerates three alternative means of committing the offense of first degree murder, one of which is in the commission of, or attempt to commit, one of eight specified felonies, and then found that the indictment in the petitioner's case "closely follows the language of the murder statute."  (*Id.* at 9-10).

After a detailed discussion of the wealth of West Virginia precedent addressing the sufficiency of indictments in cases where the State has pursued a felony murder theory, Judge Sadler concluded that:

Undeniably, the indictment of Benny Ray Roberts parallels the indictments upheld as Constitutional in *Young, Bragg, Satterfield, and Hughes* [*State v. Hughes* 457 S.E.2d 440 (W. Va. 2010)] [footnote omitted].  Furthermore, the plain language of Roberts' indictment mirrors the statutory elements of first degree murder, thereby negating Roberts' challenge to the constitutionality of his indictment.

(*Id.* at 13).  This federal court is bound by the SCAWV's interpretation of this state law.  *See Estelle v. McGuire*, 502 U.S. 67-68 (1991).

Felony murder is an exception to the theory that a murder was premeditated.  Thus, the fact that the petitioner's indictment did not contain the word "premeditatedly" did not preclude the State from pursuing a conviction based upon felony murder.  It would only prohibit the State from pursuing a first degree murder charge based upon a theory of premeditation.

34

Accordingly, under the clearly-established Supreme Court precedent in *Hamling v. United States*, 418 U.S. 87 (1974), the petitioner's indictment, which substantially followed the language of the state murder statute, was not constitutionally flawed and was sufficient to place the petitioner on fair notice of the charge against him. Therefore, the undersigned proposes that the presiding District Judge **FIND** that the petitioner has failed to demonstrate that he was denied due process of law or any other constitutional right secured by the 5th, 6th or 14th Amendments based upon the language contained in the petitioner's indictment. The undersigned further proposes that the presiding District Judge **FIND** that that the petitioner has not demonstrated that the state court's decision denying the petitioner habeas corpus relief on this basis was contrary to, or an unreasonable application of, clearly established federal law, and that the respondent is entitled to judgment as a matter of law on Ground 1(b) of the petitioner's section 2254 petition.

<u>*Sufficiency of evidence to support predicate offense of robbery and jury instructions on larceny and robbery*</u>

In Ground 1(c) of his federal petition, the petitioner contends that the jury was erroneously instructed on larceny and first degree robbery. (ECF No. 1 at 5-6). His petition states:

> The Trial Court gave the trial jury an erroneous instruction on the elements of larceny and robbery in the first degree. (<u>*State v. Roberts*</u>, Trial Transcript, pp. 961). The Court's instruction on robbery is not congruent with the 2006 statute on robbery in the first degree which specifies what elements constitute[d] robbery in the first degree in 2007.

(ECF No. 1 at 6).

The respondent asserts that the petitioner's claim concerning erroneous jury instructions fails to state a cognizable federal constitutional claim and that, at any rate,

the robbery instruction was not erroneous.  *See Swarthout v. Cooke*, 131 S. Ct. 859, 861

(2011) (per curiam) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)).  (ECF No. 13 at

18).  The respondent's Memorandum of Law further states:

> The Petitioner identifies that the jury instruction in this case on robbery included the language, "by any other violence to the person, or by the threat or presenting of firearms or by other deadly weapon or instrumentality."  Resp't's Ex. 19 at 961.  He claims this language is found in the pre-2000 version of the statute and is not contained in the post-2000 robbery statute under which he was charged.  However, even if this is so, an instruction need not parrot statutory language if the instruction[']s wording is substantially similar to the statute.  "[A]n instruction for a statutory offense is not erroneous if it substantially follows the language of the statute[.]"  *State v. Benjamin*, 359 S.E.2d 331, 342 (W. Va. 1987) [footnote omitted].  The language in the instruction is substantially similar to the 2000 version of the statute; that is, the post-2000 statute uses the wording "Committing violence to the person" and "uses the threat of deadly force by the presenting of a firearm or other deadly weapon" which is commensurate with the pre-2000 version "by any other violence to the person, or by the threat or presenting of firearms or by other deadly weapon or instrumentality."  Even if this claim was not defaulted and was cognizable, it still was not contrary to or an unreasonable application of Supreme Court precedent for the state habeas court to have found no error.  Resp't's Ex. 11 at 43.  The Petitioner has failed to show his conviction violated his federal rights.  The claims should be dismissed.

(ECF No. 13 at 18-19).

> In this case, the jury was instructed as follows on the offense of "larceny":

> "Larceny" is committed when any person steals, takes and carries away personal property of another person without his consent with the intent to permanently deprive the owner of his property.

(ECF No. 12, Ex. 19 at 960).  The court also instructed the jury on "robbery" as follows:

> "Robbery" is committed when one person takes or attempts to take from the person of another or in his presence against his will any property, money or thing of value belonging to, or in the care, custody, control, management or possession of such other person by partial strangulation or suffocation or by striking or beating or by any other violence to the person, or by the threat or presenting of firearms or by other deadly weapon or instrumentality with the intent to deprive the victim permanently of the property.

36

(*Id.* at 960-961).

Generally speaking, allegations concerning instructional error are not cognizable on federal habeas review, because they raise issues of state law, not federal constitutional law.

> It is black letter law that a federal court may grant habeas relief "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a)(West Supp. 1998*); see also Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed.2d 385 (1991) (emphasizing that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States."). Because Wright's claim, when pared down to its core, rests solely upon an interpretation of [state] case law and statutes, it is simply not cognizable on federal habeas review. *See Smith v. Moore*, 137 F.3d 808, 822 (4th Cir. 1998)(refusing to entertain claim that jury instruction misstated South Carolina law).

*Wright v. Angelone*, 151 F.3d 151, 157 (4th Cir. 1998). Nevertheless, the undersigned will address the propriety of the subject instructions.

West Virginia's robbery statute codified the common law definition of robbery, which is "the felonious taking of money or goods of value from the person of another or in his presence, against his will, by force or putting him in fear." *See Vandal v. Adams*, 115 S.E.2d 489 (W. Va. 1960); *Young v. Boles,* 343 F.2d 136 (4th Cir. 1965). The robbery statute in effect in 2007 at the time of the petitioner's alleged offense was the 2000 version of the statute, which states in pertinent part:

> (a) Any person who commits or attempts to commit robbery by:
>
> (1) Committing violence to the person, including but not limited to . . . by striking or beating . . . is guilty of robbery in the first degree . . . .

W. Va. Code § 61-2-12 (2000). The instruction given by the trial court in the petitioner's case tracked this language, contained all of the essential elements of robbery and, thus,

was a correct statement of the law.  Therefore, there appears to be no merit to the petitioner's claim that the jury was improperly instructed, at least concerning the text of the robbery instruction.

The same is true for the jury instruction on larceny.  West Virginia has codified the common law definition of "larceny" which is "the unlawful and felonious stealing, taking and carrying away of the personalty of another of some value with felonious intent on the part of the taker to deprive the owner of his property permanently."  *See Crow v. Coiner*, 323 F. Supp. 555, 560 (N.D. W. Va. 1971).  The 1994 version of the larceny statute, which would have been in effect at the time of the petitioner's alleged offense, differentiates potential penalties for petit larceny (goods or chattels under $1,000) and grand larceny (goods or chattels over $1,000), but otherwise does not discuss the elements of the offense.  The petitioner's jury instruction appears to have largely mirrored the common law definition of larceny, as well as robbery.

The state habeas court addressed the robbery instruction and the sufficiency of the evidence supporting robbery as follows:

> Based upon West Virginia Code § 61-2-12, the Court instructed the jury in the Petitioner's case that
>
>> "Robbery" is committed when one person takes or attempts to take from the person of another or in his presence against his will any property, money or other thing of value belonging to, or in the care, custody, or control, management or possession of such other person by partial strangulation or suffocation or by striking or beating or by other violence to the person, or by the threat or presenting of firearms or by other deadly weapon or instrumentality with the intent to deprive the victim permanently of the property.
>
> (R. at 175-176; Jury Trial Transcript, Volume 2 of 2 at 960-961).  Thus, the language of the "robbery" instruction contained all essential elements of the offense and was a correct statement of the law.  In addition, the Court concludes that the instruction for robbery was properly given because the

38

evidence at trial included testimony that Losey Lee Bennett had been hit in the head with a board and was beaten prior to his wallet being taken.

For these reasons, the Court finds no authority to support Petitioner's claim of error.  The trial court expressly and accurately instructed the jury on the element of felony-murder as well as the elements of the underlying felonies of breaking and entering and robbery. The court also notes that Petitioner raised this issue in his appeal, which the Supreme Court rejected outright.  Had there been any merit to the claim of error, our Court would have recognized it and addressed it on appeal.  Relief Denied.

(ECF No. 12, Ex. 11 at 43-44).

First, contrary to the petitioner's assertions, the trial court correctly instructed the jury on robbery and larceny under West Virginia law in effect at the time of the petitioner's alleged offense.  Moreover, the petitioner's conviction was upheld on appeal by the SCAWV, which has final authority on interpreting matters of state law, such as the propriety of jury instructions.  Thus, the petitioner cannot establish a federal due process violation based upon these jury instructions alone.

The petitioner's claims in Grounds 1(c) and 1(d), however, actually appear to be directed towards whether the evidence presented at trial was sufficient to warrant giving the jury instructions on first degree robbery and larceny, not whether the instructions themselves were incorrect.  In Ground 1(d), the petitioner claims that the evidence presented by the State was insufficient to permit the jury to consider robbery as the underlying felony for the petitioner's felony murder charge.  The petition further states:

Testimony at trial portrayed petitioner as the possessor of the deceased's credit card.  The State alleged that petitioner agreed to allow two men to enter without breaking a shed at a public park to which he had a key.  This agreement was not consummated.  The State asserted Mr. Bennett was beaten during a robbery.  Defense counsel told the jurors that the State would not be able to show that any of the credit cards were found on petitioner or that petitioner attempted to use any credit card that was taken from Mr. Bennett.  (*State v. Roberts*, Trial Transcript, pages 124-125).  The Trial Court denied a Defense Motion for Acquittal predicated on

the absence of sufficient evidence that Mr. Bennett died during the attempted commission of a robbery committed by petitioner or his confederates.  (*State v. Roberts*, Trial Transcript, p. 690-691).

(ECF No. 1 at 5-6).  Based upon these contentions, the petitioner asserts that "it is an unreasonable application of established federal law for a state court to impose a life sentence for murder when the state failed to prove [sic] failed to establish beyond a reasonable doubt that Mr. Losey Lee Bennett, Sr., was killed by petitioner or one of his associates during the commission of a robbery on September 19, 2007."  (*Id.* at 6).

The respondent's Memorandum of Law addresses this claim as follows:

> The Petitioner claims there was insufficient evidence (1) to prove robbery because "presumably" the victim was unconscious when his wallet was taken and thus could not be in fear; and (2) to prove larceny because credit cards are not money, goods or chattels.  These are incorrect assertions.

(ECF No. 13 at 19).  The respondent notes that "the elements of robbery include 'by force *or* putting [the victim] in fear.'"  *State v. Wilkerson*, 738 S.E.2d 32, 38 (W. Va. 2013) (emphasis in original) (quoting *State v. Harless*, 285 S.E.2d 461, 463-64 (W. Va. 1981)).  (*Id.*)  The respondent further contends that the petitioner admitted that he agreed to unlock the door of the shed at Pinnacle Rock State Park so Ernie Graham could steal "some brand new stuff out there" to sell it.  (ECF No. 12, Ex. 19 at 358-59; ECF No. 13 at 19).  The respondent's Memorandum of Law further states:

> When the Petitioner arrived at Pinnacle Rock, he saw Ernie as well as the victim.  *Id.* at 368.  The victim was operating a piece of machinery.  *Id.* at 368.  The Petitioner told the police that he saw Ernie and "John Paul" try to strike the victim, and then yanked the victim off the machinery, while Ernie struck the victim with a board and John Paul kicked the victim "[e]verywhere[.]"  *Id.* at 372-73.  The victim was awake at this time and said "help" at least once, *id.* at 373, and was trying to get up.  *Id.* at 374.  Ernie took the wallet out of the victim's pockets.  *Id.* at 381.
>
> The evidence is not at all clear that the victim was unconscious when the cohorts took his wallet.  And even if not, the fact that the victim

was beaten and his wallet removed also satisfied robbery because it is not just fear, but violence that suffices for robbery.

Second, the Petitioner admitted to taking the credit cards. *Id.* at [385]. And for purposes of larceny (as an element of robbery), "[i]t is immaterial of what value the thing taken is: a penny as well as a pound thus forcibly extorted makes a robbery." 4 Blackstone, *Commentaries* *242. Therefore, the taking of credit cards is the taking of a good or chattel, since the card itself – regardless if what it represents - is a tangible item. "[A]t common law only the card itself, not the line of credit it represented, could be the subject of larceny." *Owolabi v. Commonwealth*, 428 S.E.2d 14, 16 (Va. Ct. App. 1993).

(ECF No. 13 at 19-20).

The petitioner's Reply asserts that the State also failed to prove beyond a

reasonable doubt that the petitioner formed any intent to rob Bennett prior to his death.

(ECF No. 20 at 11). The Reply further states:

When the evidence is viewed in the light most favorable to the state, the only palpable intent was petitioner's willingness to enable the commission of a non-violent removal of state property from a shed. There is no palpable evidence to support a robbery conviction predicated on petitioner's expressed intent to rob Mr. Bennett or that such intent to rob Mr. Bennett was formed prior to Mr. Graham striking him.

(*Id.*) The petitioner further contends:

As the state's motion explicitly or implicitly disputes petitioner's factual allegation that petitioner did not form the intent to rob Mr. Bennett prior to Mr. Graham's unsolicited assault on Mr. Bennett, there is a genuine issue as to a material fact and respondent is not entitled [to] summary judgment.

(*Id.* at 12).

The petitioner also asserts that the State failed to prove that he took Bennett's

"money or goods." (*Id.*) His Memorandum in Support of his section 2254 petition also

touched on this issue, claiming that "an individual's credit card is not money or goods at

common law." (ECF No. 2 at 5). The petitioner contends, however, that, even if the

State correctly asserts that a credit card is a good or chattel, "[i]f anyone took Mr.

Bennett's credit card, it was Mr. Graham.  Petitioner submits that the State did not corroborate petitioner's admission of receiving Mr. Bennett's credit card after the robbery.  Mr. Bennett's wallet was among his personal property at the hospital."[6]  (*Id.*)

The petitioner further asserts that there is an absence of evidence demonstrating that he personally assaulted Bennett.  (ECF No. 20 at 13).  Finally, the petitioner contends that the "*corpus delecti*" may not be established solely by the accused's extrajudicial confession.  *State v. Garrett*, 466 S.E.2d 481, 491-492 (W. Va. 1995); *State v. Dean*, 363 S.E.2d 467, 471-472 (W. Va. 1987).  (*Id.* at 13-14).  The petitioner's Reply further sates:

> The State failed to corroborate petitioner's incriminating statements.  The State has not arrested, indicted, prosecuted, convicted, or sentenced Ernie Graham for his deadly assault on Mr. Bennett.  It [sic; In] the absence of proof beyond a reasonable doubt that Mr. Graham murdered Mr. Bennett, petitioner's statements to that effect are uncorroborated.

(*Id.* at 14).  The petitioner further contends that:

> In order to prove the commission of the offense of "First Degree Murder-Felony Murder," the State of West Virginia must overcome the presumption of innocence and prove beyond a reasonable doubt, six (6) essential elements:  1) Benny Roberts, 2) on September 19, 2007, 3) in Mercer County, 4) participated in the commission of a robbery, 5) and during the commission of the said robbery, 6) the death of L. Bennett resulted as a direct result of the injuries received in the commission of robbery in which the defendant participated.  Petitioner did not participate in the commission of a robbery.  Petitioner did not strike Mr. Bennett.  Petitioner did not take Mr. Bennett's money.

(*Id.* at 15).

In addressing these claims, this court must again look to the clearly-established precedent in *Jackson v. Virginia*, *supra*, to determine whether "in the light most

---

[6]  There is no evidence of record to support this contention and, in fact, Sgt. Michael Smith testified that Bennett's wallet and credit cards, some of which were joint accounts with his wife, were missing, and his wife canceled them.  (ECF No. 12, Ex. 19 at 486).

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319.

The evidence presented at trial was sufficient to establish that the petitioner was involved in the taking of property, money or a thing of value from Losey Lee Bennett by striking or beating him with the intent to deprive him of it permanently. Even if the petitioner was not the person who struck Bennett, based upon the evidence as a whole, he may still be found guilty of robbery as an aider and abettor or an accessory – a principal in the second degree – and the jury was properly instructed on those roles. (ECF No. 12, Ex. 19 at 962-963).

As noted by the state habeas court, "the instruction for robbery was properly given because the evidence at trial included testimony that Losey Lee Bennett had been hit in the head with a board and was beaten prior to his wallet being taken." (ECF No. 12, Ex. 11 at 43). In the light most favorable to the State, a rational trier of fact could have found the essential elements of first degree robbery beyond a reasonable doubt based upon those facts. Furthermore, because Bennett died as a result of injuries he sustained in the course of this altercation, the evidence also supported the jury's finding of guilt on the charge of felony murder.

Thus, the undersigned proposes that the presiding District Judge **FIND** that the petitioner has not demonstrated a violation of his due process rights based upon the giving of instructions on larceny and first degree robbery. Nor has the petitioner demonstrated that his conviction for felony murder based upon a robbery or attempted robbery violated his due process rights. Therefore, the undersigned further proposes that the presiding District Judge **FIND** that that the petitioner has not demonstrated that the state courts' decisions denying the petitioner habeas corpus relief were contrary

to, or an unreasonable application of, clearly established federal law, and that the respondent is entitled to judgment as a matter of law on Grounds 1(c) and 1(d) of the petitioner's section 2254 petition.

<u>*Failure to charge petitioner under more specific statutes*</u>

In Ground 1(e) of his federal petition, the petitioner asserts that the State violated his due process rights because they impermissibly charged him with felony murder based upon robbery or breaking and entering, when, he contends, his conduct, if proven, constitutes a violation of more specific West Virginia criminal statutes.  The petition states:

> Given the evidence introduced at trial, the jury should have determined whether the petitioner was guilty of either the fraudulent use of credit card as proscribed by W. Va. Code § 61-3-24a(b)(3) (1994, c. 108) or the receiving of stolen property as proscribed by W. Va. Code § 61-3-19 rather than prosecuted for the commission of a common law robbery.  Since the court failed to instruct the jury on fraudulent use of a credit card . . . or receiving stolen property . . . a fair inference of this omission may be attributed to counsel's lack of preparation and failure to propose instructions detailing the elements of these two offenses.

(ECF No. 1 at 6).  In addition to these other statutes, the petitioner's Memorandum in Support also compares a credit card to checks, and asserts that the trial court failed to instruct the jury on the elements of larceny of bank notes, checks, writings of value and book accounts, as proscribed by W. Va. Code § 61-3-14.  (ECF No. 2 at 5-8).  The petitioner contends that, had his counsel proposed instructions on these crimes, and the trial court given such instructions, "there is a reasonable probability that the trial jury would not have found him guilty of felony murder predicated on the commission of robbery in the first degree."  (*Id.* at 8).

44

The respondent's Memorandum of Law in support of his Motion for Summary Judgment contends that this ground for relief fails to demonstrate any constitutional error. (ECF No. 13 at 21). The Memorandum of Law further states:

> It is within the discretion of the prosecutorial arm of the State to determine what charges to bring, which includes determining what statutes to invoke when a defendant's conduct may violate two or more statutes. *State ex rel. Chadwell v. Duncil*, 474 S.E.2d 573, 577-78 (W. Va. 1996). "[A] defendant has no constitutional right to elect which of two applicable . . . statutes shall be the basis of his indictment and prosecution[.]" *United States v. Batchelder*, 442 U.S. 114, 125 (1979). *See also Garrett v. United States*, 471 U.S. 773, 790 (1985) ("The Government . . . is responsible for initiating a criminal prosecution, and subject to applicable constitutional limitations it is entitled to choose those offenses for which it wishes to indict and the evidence upon which it wishes to base the prosecution.") And, indeed, the Fourth Circuit has itself rejected a claim that the courts may void a conviction otherwise valid if another statute provides a better fit for the alleged misconduct. *United States v. Ryan-Webster*, 353 F.3d 353, 362 n.14 (4th Cir. 2003). *See also United States v. Brewer,* 528 F.2d 492, 498 (4th Cir. 1975) (". . . the mail fraud statute has been employed to prosecute persons whose fraud broke other federal laws.").

(*Id.*)

The respondent further contends that none of the offenses cited by the petitioner are lesser included offenses of robbery or breaking and entering, and that, at any rate, the United States Supreme Court has never held that a defendant has a constitutional right to an instruction on a lesser-included offense in a non-capital case, such as this, much less instructions on offenses that are not lesser-included. *See, e.g., Martin v. Ballard*, 6:07-cv-00014, 2008 WL 803155 (S.D. W. Va., Mar. 20, 2008) (citing *Beck v. Alabama*, 447 U.S. 625, 638 n.14 (1980); *Bates v. Lee*, 308 F.3d 411, 418 (4th Cir. 2002)). (*Id.* at 21-24). Likewise, the respondent contends that the petitioner cannot successfully assert that his counsel was ineffective for not proposing instructions to which the petitioner was not entitled. (*Id.* at 22).

The petitioner's Reply asserts that "[t]he WV Legislature enacted specific laws that criminalize the conduct described by petitioner in his statements.  Basic principles of due process afford defendants the right to instructions which support the defense theory that are adequately supported by the evidence adduced at trial, *United States v. Carter*, 540 F.2d 753 (4th Cir. 1976)."  (ECF No. 20 at 10-11).

A review of the entire records indicates that this federal petition is the first time that the petitioner has alleged a violation of his constitutional rights based upon the failure to charge the petitioner with, or instruct the jury on, these other allegedly "more specific" crimes.  Nevertheless, under any applicable standard of review, the petitioner is not entitled to habeas corpus relief on this basis.

As aptly noted by the respondent, the prosecutor has discretion in determining what charges to bring against a defendant.  The petitioner has not demonstrated that the statutes cited in his section 2254 petition and Reply are lesser included offenses of first degree robbery or breaking and entering.

Moreover, claims regarding jury instructions do not state a federal claim absent a showing that an instruction "by itself so infected the entire trial that the resulting conviction violates due process."  *Cupp v. Naughten*, 414 U.S. 141, 94 S. Ct. 396, 38 L. Ed.2d 368 (1973).  Moreover, the omission of a required jury instruction, as alleged here, is "less likely to be prejudicial than a misstatement of the law."  *Hendrickson v. Kibbe*, 413 U.S. 145, 155 (1977).  Inasmuch as the petitioner is claiming he was denied an instruction on his theory of defense, this claim would still fail.  "Failure to give an appropriate theory-of-defense instruction, without more, is not a violation of the Due Process Clause.  Some other circumstances, demonstrating a serious miscarriage of

justice, must be present." *Nickerson v. Lee*, 971 F.2d 1125, 1138 (4th Cir. 1992) (citation omitted).

Thus, the undersigned proposes that the presiding District Judge **FIND** that the petitioner has not demonstrated a violation of his due process rights based upon the giving of instructions on larceny and first degree robbery.  Nor has the petitioner demonstrated that his conviction for felony murder based upon a robbery or attempted robbery violated his due process rights.  Therefore, the undersigned further proposes that the presiding District Judge **FIND** that that the petitioner has not demonstrated that the state courts' decisions denying the petitioner habeas corpus relief were contrary to, or an unreasonable application of, clearly established federal law, and that the respondent is entitled to judgment as a matter of law on Ground 1(e) of the petitioner's section 2254 petition.

### *Sufficiency of evidence to support predicate offense of breaking and entering and denial of a fair trial when the court adopted the State's definition of "breaking"*

In Grounds 2(b) and 2(c) of his federal petition, the petitioner also asserts that his due process rights were denied because the State failed to prove that the petitioner participated in a breaking and entering or attempted breaking and entering during which Losey Lee Bennett was killed.  (ECF No. 1 at 7-9).  In Ground 2(b), the petitioner contends that there was no evidence of "breaking" because the petitioner had a key to the tool shed and allegedly had permission to enter it.  In Ground 2(c), the petitioner contends that there is no evidence of intent because no property was actually taken.

Related to these claims, in Ground 4 of his federal petition, the petitioner contends that he was denied a fair trial when the trial court, over the defense's objection, found that the definition of "breaking" was a question of law, not fact.  (ECF No. 1 at 12-

13).  The petitioner further contends that the court's instruction on "breaking" favored the prosecution and lowered the State's burden of proof.  (*Id.* at 13).

During the petitioner's trial, the jury was instructed as follows on "breaking and entering" and "breaking:"

> "Breaking and entering" is committed when any person breaks and enters any office, shop, storehouse, warehouse, banking house or any house or building other than a dwelling house or outhouse adjoining thereto or occupied therewith, or any railroad or traction car, propelled by steam, electricity, or otherwise, or any steamboat or other boat or vessel, with intent to commit a felony or any larceny therein.

> "Breaking" is defined as the breaking of the property surrounding and forming the close of a structure.  Breaking includes any effort that is required to remove an obstruction so as to permit an entry and without which such effort and entry would not be made.  It does not necessarily require physical damage to the property.

(ECF No. 12, Ex. 19 at 960).  The breaking and entering instruction parallels the statutory language of W. Va. Code § 61-3-12, concerning "entry of a building other than a dwelling," which also includes the phrase "or shall enter without breaking."  W. Va. Code § 61-3-12.  As will be discussed further *infra*, the instruction on "breaking" was derived from the common law definition, as West Virginia has not formulated a specific definition of breaking.

The petitioner's section 2254 petition further states:

> Under W. Va. law, the statutory offense of breaking and entering is the entering of a building [other than a dwelling] with the intent to commit a felony.  W. Va. Code § 61-3-12.  To prove the commission of breaking and entering, the State must prove eight elements of the offense beyond a reasonable doubt:  1) the defendant, 2) on Sept. 19, 2007, 3) in Mercer County, WV, 4) did feloniously (a) break and enter, 5) a building, 6) which was not a dwelling house, 7) owned by the State of West Virginia, and 8) with the intent to commit a larceny.  W. Va. Code § 61-3-12 (Code 1923, c. 145, §§ 12, 13).

> Breaking is an essential element of the crime of breaking and entering.  W. Va. Code § 61-3-12 (Code 1923, c. 145.)  In the present case,

48

there was no breaking and entering of the building to which petitioner had a key.  Because no property was removed from the shed, there is no objective evidence of petitioner's intent on the night the victim died. Petitioner submits the latter element is absent in the present case. Petitioner had the owner's permission to enter the storehouse.

An essential element of this offense is absent.  There was no breaking or entering of the tool shed.  In W. Va., the felony murder rule holds that any death resulting from the commission of a breaking and entering is murder.  The statute does not hold that any death resulting from the commission of an entering without breaking is murder.  The evidence at trial did not establish there was a breaking and entering of the tool shed on September 19, 2007.  Therefore, petitioner submits that the imposition of a life sentence for felony murder predicated on the commission of an entry without breaking is an illegal sentence.

Petitioner submits it is an unreasonable application of the clearly established federal constitutional law for a state habeas court to impose a life sentence for murder when the state failed to prove [sic] failed to establish beyond a reasonable doubt that Mr. Losey Lee Bennett, Sr., was killed during the commission of a breaking and entering on September 19, 2007.

(ECF No. 1 at 8-9).

The respondent's Memorandum of Law in support of his Motion for Summary Judgment asserts that the petitioner's claims that there was no breaking and entering or attempted breaking and entering lack merit.   First, concerning the petitioner's contention that there is no evidence of a breaking because the petitioner had a key to the shed and permission to enter it, the respondent notes that, "the evidence does not sustain his contention that he has permission to use [the key] at will; rather, he was permitted to use the key only when actually working."   (ECF No. 13 at 24).   The respondent also looks to a case from another jurisdiction in which the court held that "possession and use of a key does not necessarily avoid the charge of breaking[.]"  *State v. Woodmansee*, 205 A.2d 407, 411 (Vt. 1964).  (*Id.*)

The respondent asserts that the petitioner specifically told the police that his role in the agreement to steal power equipment from the park was to unlock the door to the shed with a key.  (ECF No. 12, Ex. 19 at 361; ECF No. 13 at 24).   However, the respondent further notes that "Park Superintendent Robert Ratcliff testified the Petitioner had no permission to use the key when the Petitioner was off duty."  (ECF No. 12, Ex. 19 at 166; ECF No. 13 at 24).

Second, concerning the petitioner's argument that the State did not prove the required element of intent to commit a felony of larceny because no property was taken, the respondent's Memorandum of Law states:

> The jury was presented with the Petitioner's intent by his own statement to the police – that he was going to unlock the machinery for which Ernie "would give him something[.]"  Resp't's Ex. 19 at 362.  And whether or not there *was* a breaking and entering, *see* Pet. at 9, is immaterial because one may be guilty of felony murder where there was merely an attempt to commit the predicate felony.  "W. Va. Code 61-2-1 (1991) provides that '[m]urder . . . in the commission of, or *attempt to commit* . . . breaking and entering . . . is murder of the first degree.'"  *State v. Hottle*, 476 S.E.2d 200, 209-10 (W. Va. 1996).  To constitute an attempt, there must be, "'(1) a specific intent to commit the underlying substantive crime; and (2) an overt act toward the commission of that crime, which falls short of completing the underlying crime.'"  *State v. Davis*, 519 S.E.2d 852, 860 (W. Va. 1999) (citations omitted).  And here there was an attempt.  The Petitioner admitted he was not allowed on the Pinnacle Rock State Park property on the night of the murder, Resp't's Ex. 19 at 215, he agreed to unlock the doors, which would constitute a breaking, and he did so that Ernie could take tools, *id.* at 358-259, he had talked about it to Ernie three or four times, *id.* at 582, and he actually took an overt act toward the crime by showing up at the park.  *See also id.* at 690.  And by the Petitioner's own admission, even if no one was supposed to get hurt, the victim did get hurt during the course of the felony because the victim "was there and he was in the way."  *Id.* at 552-53.

(ECF No. 13 at 24-25).

The petitioner's Reply and Supplemental Reply contend that the petitioner "abandoned the agreement to open the tool shed when it was discovered that Mr.

Bennett was present.  Therefore there was no intentional act of support of a prior agreement to commit a breaking and entering."  (ECF No. 20 at 21; ECF No. 23 at 17).

 The petitioner's Reply and Supplemental Reply also focus on the definition of "breaking" and whether there was even sufficient evidence to demonstrate an attempted "breaking and entering of a non-dwelling" in order to support a felony murder conviction.  The petitioner notes that Judge Sadler's Order Denying Habeas Petition states that "the definition of breaking posed some controversy because West Virginia has not yet formulated a specific definition."  (ECF No. 12, Ex. 11 at 42).  Judge Sadler's Order further recounts the charge conference colloquy in which defense counsel argued that the meaning of "breaking" was a question of fact for the jury, and the prosecutor asserted that it was a question of law for the court.  (ECF No. 12, Ex. 19 at 928-935). Judge Sadler's Order cites his ruling from the charge conference as follows:

> Well, as I indicated I think this is a case where the Court needs to give guidance to the jury.  The Court's already mentioned that the Court thinks that the stat[e] of law with regards to the breaking definition in the State of West Virginia is the common law definition.  And that although our Court has never defined what that definition is, I think that the common law from other states gives us guidance as to what the common law definition is here in West Virginia on the definition of breaking.

(ECF No. 12, Ex. 19 at 930-931; ECF No. 12, Ex. 11 at 42).  Having then given the instruction cited above to the jury, Judge Sadler's Order Denying Habeas Petition further states that he found "no error, much less a constitutional violation in the Court's instruction on 'breaking and entering.'"  (ECF No. 12, Ex. 11 at 42).

 The petitioner's Reply asserts that the "breaking" instruction that Judge Sadler gave at his trial was "not prescribed by the State Legislature" and "exceeded the common law definition of breaking."  (ECF No. 20 at 20).  The petitioner further asserts that Defendant's Instruction No. 12, which was not given at trial, would have provided

51

the jury with the essential elements of felony murder predicated on "breaking and entering a non-dwelling" (and presumably would have attempted to differentiate the petitioner's theory of "entering without breaking").  Thus, the petitioner contends that the failure to give his instruction violated his due process rights.  (*Id.*)  The petitioner's Supplemental Reply further asserts that "[a] defendant on trial for a capital offense is entitled to have the Court instruct the jury on lesser included offenses.  *Beck v. Alabama*, 447 U.S. 625, 643, 46 (1980).  (ECF No. 23 at 3).  The petitioner contends that, in West Virginia, murder is a capital offense because the maximum sentence is life without mercy.  Thus, he claims that he was denied a fair and impartial jury trial because the jury was not instructed on "entering without breaking," which he claims is a lesser-included offense of "breaking and entering."  (*Id.* at 3-4).

This federal court is not in possession of the actual text of Defendant's Instruction No. 12, because the text of the proposed instruction was not read or placed into the state court record that is before this court.  However, based upon a thorough examination of the transcript memorializing the charge conference, it is apparent that petitioner had an opportunity to argue the merits of the proposed jury instruction and to lodge an objection to the failure to give the specific instruction.  (ECF No. 12, Ex. 19 at 932-935).  He also unsuccessfully raised this issue in his direct appeal.  (ECF No. 12, Ex. 2).

The petitioner's Supplemental Reply further addresses the petitioner's claim in Ground Four concerning whether the trial court's instruction on "breaking," when coupled with the way the prosecutor was permitted to argue the element of breaking in his closing argument, lowered the State's burden of proof and limited the defense's ability to argue that his conduct constituted an attempted "entering without breaking,"

52

which the petitioner further claims would remove his conduct from the ambit of the enumerated felonies under the felony murder rule.  The petitioner contends that the inability to make such an argument based upon the trial court's definition of "breaking" essentially constituted a *de facto* directed verdict for the State.  (ECF No. 23 at 1-12).

The petitioner's Reply documents also appear to make unfounded arguments that "breaking and entering" as an enumerated felony for felony murder must be based upon the entry of a dwelling house as defined under W. Va. Code § 61-3-11 (*i.e.,* a "burglary" or "daytime entry of a dwelling"), and not upon W. Va. Code § 61-3-12, which governs the entry of a non-dwelling, because, otherwise, it is not an inherently dangerous crime. The petitioner notes that this argument was also made in his direct appeal to the SCAWV, which was summarily refused.  (ECF No. 12, Ex. 2 at 36-39; ECF No. 20 at 6). The petitioner's Supplemental Reply also asserts that there can be no breaking and entering of public property, because members of the public are "collective owners" of the land, and "one cannot be convicted of breaking into one's own property."  (ECF No. 23 at 11).  These arguments are patently frivolous.   Additionally, the petitioner's argument made for the first time in his Supplemental Reply that his conviction should be reversed because of a general guilty verdict (ECF No. 23 at 12-14) appears to be foreclosed by the Supreme Court's holding in *Griffin v. United States*, 502 U.S. 46 (1991), as further addressed by the SCAWV in *State v. Berry*, 707 S.E.2d 831, 837-839 (W. Va. 2011) (a general verdict is valid even where a charge is prosecuted under two theories of liability if there is sufficient evidence to support either theory).

The petitioner has advanced numerous claims concerning the sufficiency of the evidence for his conviction for felony murder based upon breaking and entering or an attempted breaking and entering.  However, the petitioner's felony murder conviction

was upheld on appeal, after he specifically raised these same claims of error concerning the trial court's definition of "breaking," the failure to instruct the jury on "entering without breaking," and the alleged failure to prove that he committed an enumerated offense sufficient to justify his felony murder conviction.   (ECF No 12, Exs. 2 and 5). The SCAWV found no error in the trial court's handling of either the legal or factual issues concerning whether breaking and entering, or the attempt thereof, was an appropriate predicate felony for the petitioner's felony murder conviction.  This federal habeas court cannot second-guess the SCAWV's interpretation of its own state law.  *See Estelle, supra*, 502 U.S. at 67-68.

The state habeas court acknowledged the SCAWV's refusal of the petitioner's direct appeal when making its findings in the petitioner's Circuit Court habeas proceeding:

> The trial court expressly and accurately instructed the jury on the elements of felony-murder as well as the underlying felonies of breaking and entering and robbery.  The court also notes that Petitioner raised this issue in his appeal, which the Supreme Court rejected outright.  Had there been any merit to the claim of error, our Court would have recognized it and addressed it on appeal.  Relief Denied.

(ECF No. 12, Ex. 11 at 45).  Judge Sadler's Order Denying Habeas Petition also quoted his prior ruling denying the petitioner's motion for a new trial as follows:

> "[w]ith regard to the insufficient evidence to uphold a verdict, the Court feels like the theory that the State was proceeding under was Felony Murder Theory.  The Court feels like there was sufficient elements put forth through the evidence to sustain a conviction for Felony Murder and that the defendant was involved in a conspiracy to conduct a breaking and entering of the ... upon Pinnacle Rock State Park and during the course of the commission of that offense [of breaking and entering] ..., Mr. Bennett lost his life.  And in reviewing the evidence in the light most favorable to the State, that there was sufficient evidence for the jury to find the Defendant guilty under the Felony Murder Theory.  So therefore the Court would deny at this time the Defendant's motion for new trial.

(ECF No. 12, Ex. 11 at 36).   The Order Denying Habeas Petition further states:   "In hindsight, and after again reviewing the evidence, the Court still concludes that evidence adduced at trial supported the verdict.   Moreover, the West Virginia Supreme Court likewise found no merit to the claim on appeal and refuse[d] Petitioner's appeal outright."   (ECF No. 12, Ex. 11 at 36).

The undersigned proposes that the presiding District Judge **FIND** that the petitioner has not demonstrated that his conviction for felony murder based upon a breaking and entering, or attempted breaking and entering, violated his due process rights.   Therefore, the undersigned further proposes that the presiding District Judge **FIND** that that the petitioner has not demonstrated that the state courts' decisions denying the petitioner habeas corpus relief were contrary to, or an unreasonable application of, clearly established federal law, and that the respondent is entitled to judgment as a matter of law on Grounds 2(b), 2(c) and 4 of the petitioner's section 2254 petition.

### C.    The petitioner's claims of ineffective assistance of counsel.

In Ground 3 of his federal petition, the petitioner alleges several claims of ineffective assistance of counsel by his trial and appellate counsel, Jason Grubb and Michael P. Cooke.   The undersigned will first address the standards for reviewing ineffective assistance of counsel claims and will then address each claim in turn.

In *Strickland v. Washington*, 466 U.S. 688 (1984), the Supreme Court adopted a two-prong test for determining whether a defendant received adequate assistance of counsel.   A defendant must show (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

55

*Id.* at 687-91.  Moreover, "judicial scrutiny of counsel's performance must be highly deferential."  *Id.* at 689.  Furthermore, the AEDPA "adds a layer of respect for a state court's application of the legal standard."  *Holman v. Gilmore*, 126 F.3d 876, 881 (7th Cir. 1997).

In reviewing a trial counsel's performance, there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance, *id.* at 689, and the burden is on the Petitioner to show prejudice.  *Hutchins v. Garrison*, 724 F.2d 1425 (4th Cir. 1983).  Further, "[a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.  A petitioner may not merely speculate about potential prejudice but must "affirmatively prove" that the result of the proceedings would have been different but for the deficient performance of trial counsel.  *See Strickland*, 466 U.S. at 693.  Using this standard, the undersigned will address each of Petitioner's claims of ineffective assistance of counsel.

### *Failure to challenge the indictment and the applicability of felony murder rule*

In Grounds 3(a) and 3(b) of his federal petition, the petitioner contends that his trial counsel, Michael Cooke and Jason Grubb, provided ineffective assistance of counsel because they failed to challenge the applicability of the felony murder rule to the facts of his case and, in particular, failed to seek a writ of prohibition from the SCAWV to prohibit the State from proceeding on a felony murder theory.  (ECF No. 1 at 10).

The basis of these claims, again, is the petitioner's contention that the evidence did not support a finding that the petitioner had engaged in either a robbery or a breaking and entering, or the attempt thereof, that caused the death of Losey Lee

56

Bennett.  These claims also appear to be largely predicated on the petitioner's argument in Ground 3(c) of his federal petition, which asserts that defense counsel failed to challenge the indictment based upon the fact that the building in question in this case was not a dwelling and, thus, the alleged breaking and entering was not a felony that was foreseeably or inherently dangerous to human life, which would warrant exposure to the felony murder rule.  (ECF No. 1 at 10-11).

The section 2254 petition states:

Mr. Grubb and Mr. Cooke did not file a writ of prohibition seeking to prohibit the State of West Virginia from prosecuting their client for felony murder predicated on an attempted entering without breaking.  Counsel's failure to challenge the applicability of the felony murder rule to the primary charge against their client may reasonably be attributed to their failure to conduct a proper investigation and inadequate legal research. Petitioner submits a proven violation of W. Va. Code § 61-3-13 (Code 1923) is not the enumerated offense referred to in W. Va. Code § 61-2-1 (1991 c. 38) as "breaking and entering" because the alleged building to be entered in this case was not a dwelling house, and the crime sanctioned in W. Va. Code § 61-3-13 (Code 1923) is not a felony which is inherently or foreseeably dangerous to human life for the express purpose of the felony murder doctrine.  50 ALR 3d 397.  Petitioner respectfully submits that the prosecution failed to prove the commission by petitioner or one of his associates of a breaking and entering which is the enumerated offense supporting an invocation of the felony murder rule.  Entering without breaking is not an enumerated felony within the state's felony murder statute.  Therefore, petitioner contends he was denied his constitutional right to a complete defense.

(ECF No. 1 at 10).

The respondent's Memorandum of Law in support of his Motion for Summary Judgment contends that the petitioner's claim that the jury was improperly instructed on breaking and entering because the building the petitioner was going to break into was not a dwelling completely lacks merit.  (ECF No. 13 at 27).

Judge Sadler's Order Denying Habeas Petition addresses this claim as follows:

> First and foremost, there is no reasonable likelihood that the outcome of Benny Ray Roberts' case would have been different had defense counsel filed a writ of prohibition. Quite simply and for the reasons previously discussed, felony-murder predicated on (1) attempted breaking and entering; (2) breaking and entering; (3) attempted robbery; or (4) robbery is constitutionally sound and viable criminal offense. In addition and contrary to Petitioner's assertion, W. Va. Code 61-3-13 has no bearing whatsoever on this case; W. Va. Code § 61-[3]-12 is the applicable code section on breaking and entering, which is precisely what the jury instructions reflect. Thus, regardless of which lesser crimes Benny Ray Roberts would have preferred to have been charged with, the fact remains that he was indicted exclusively on the charge of first-degree murder, which includes felony-murder, and no writ of prohibition would have negated the indictment for the first degree murder.

(ECF No. 12, Ex. 11 at 29-30).

"Breaking and entering" is an enumerated felony under W. Va. Code § 61-2-1, which governs felony murder. The undersigned has not been able to locate, no has the petitioner cited, any authority limiting the application of the felony murder rule to breaking and entering of a dwelling in West Virginia, and the SCAWV upheld the petitioner's felony murder conviction under the facts of this case, which involved a non-dwelling. This federal court is bound by the SCAWV's interpretation of state law.

Moreover, to the extent that the petitioner may be asserting that, at most, his conduct could only support a conviction for petit larceny under W. Va. Code § 61-3-13, the state habeas court correctly found that W. Va. Code § 61-3-13 is inapplicable to this case. As found by the state court, the evidence at trial supported a finding that the petitioner's conduct met the essential elements of an attempted breaking and entering of a non-dwelling, which is defined in W. Va. Code § 61-3-12. That code section provides in pertinent part that any person who breaks and enters, or enters without breaking, a non-dwelling with intent to commit "a felony or <u>any larceny</u>" is guilty of a felony. W. Va.

Code § 61-3-12.  Thus, any attempt to remove or take property from the park building would constitute a felony offense sufficient to support a felony murder conviction. Therefore, the petitioner's argument concerning the applicability of W. Va. Code § 61-3-13 to his case lacks merit.

These arguments of ineffective assistance of counsel are otherwise foreclosed by the undersigned's prior proposed findings concerning the state court's rulings on the sufficiency of the instructions given and the sufficiency of the evidence presented at trial.  Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the petitioner has not demonstrated that his counsels' alleged failure to challenge the applicability of the felony murder rule to the facts of his case, either by seeking a writ of prohibition from the SCAWV, or to otherwise make arguments or objections in his criminal proceedings, fell below an objective standard of reasonableness, or that the results of the proceedings would have been different had they pursued such challenges.  Therefore, he cannot establish the requisite prejudice under *Strickland*.

### *Failure to challenge conviction based upon statutory language re "penitentiary"*

In Ground 3(d) of his federal petition, the petitioner further asserts that, prior to April 1, 2008 (and thus, at the time of the petitioner's alleged offense), the statutory language of the "breaking and entering" statute, W. Va. Code § 61-3-12, mandated incarceration in "the penitentiary."  In light of the West Virginia Penitentiary's closure in 1995, however, the petitioner contends that "there is no lawful confinement upon conviction for this offense."  (ECF No. 1 at 11).  Thus, the petitioner asserts that he is being illegally confined.  (*Id.*)  He elaborates on this contention in his Reply.  (ECF No. 20 at 25).

The respondent's Memorandum of Law first asserts that the petitioner was not actually convicted of breaking and entering under W. Va. Code § 61-3-12; rather, he was convicted of first degree murder under W. Va. Code § 61-2-1, and that the predicate felony merged with the murder conviction.  The respondent further asserts that W. Va. Code § 61-2-1 does not specify where the incarceration is to be served.  (ECF No. 13 at 27).  More to the point, however, when the West Virginia Penitentiary closed, the State opened the Mount Olive Correctional Complex, which is the state's maximum security prison, the equivalent of a penitentiary, which is where the petitioner is presently incarcerated.  Thus, this claim is patently frivolous.

Additionally, as aptly noted by the respondent, the Supreme Court has held that an inmate has no justifiable expectation that he will be incarcerated in any particular correctional facility.  *See Meachum v. Fano*, 427 U.S. 215 (1976); *Montanye v. Haymes*, 427 U.S. 236 (1976); *Olim v. Wakinekona*, 461 U.S. 238, 245 (1983).  Raising this claim for the first time in these federal proceedings, the undersigned proposes that the presiding District Judge **FIND** that the petitioner has not demonstrated any violation of his constitutional rights based upon his incarceration in a state prison and the petitioner cannot demonstrate ineffective assistance of counsel for failing to challenge his conviction and sentence on this basis.

<u>*Failure to discuss indictment with petitioner*</u>

In Ground 3(e) of his federal petition, the petitioner contends that his trial counsel did not discuss his indictment with him.  (ECF No. 1 at 11).  The petition further cites to the state habeas court's Order Denying Habeas Petition, which documented the amount of time the petitioner's attorneys spent with him.  Judge Sadler found that Mr. Cooke and Mr. Grubb spent approximately 117 hours with the petitioner and concluded

that "it is unfathomable to believe that counsel did not discuss the charges against the petitioner at any time during the 117 hours of conferences." (*Id.*; ECF No. 12, Ex. 11 at 29).

The petitioner's contention is further belied by his counsel's testimony at the omnibus hearing held on March 2, 2012. (ECF No. 12, Ex. 21). As noted by the respondent:

> [A]t the State habeas evidentiary hearing, Mr. Cooke testified that he represented the Petitioner and that he discussed the felony-murder rule with the Petitioner, Resp't's Ex. 21 at 68, and he discussed the facts of the case with the Petitioner. *Id.* at 69. *See also id.* at 87 (Mr. Grubb, trial co-counsel, testifying that because of the Petitioner's limitations in understanding the felony-murder rule that Mr. Grubb spent a lot of time with the Petitioner). The Petitioner has failed to demonstrate that counsel failed to discuss either the facts or law of the case with the Petitioner. The Petitioner has failed to show his conviction violated his federal rights. This claim should be dismissed.

(ECF No. 13 at 28). The petitioner's Reply documents do not further address this issue.

The undersigned proposes that the presiding District Judge **FIND** that the petitioner has not demonstrated that his counsels' performance fell below an objective standard of reasonableness or that there is a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different.

### *Failure to file timely appeal*

Finally, in Ground 3(f) of his federal petition, the petitioner contends that Mr. Cooke and Mr. Grubb, who continued to represent the petitioner through his direct appeal, failed to timely file his Petition for Appeal. (ECF No. 1 at 11). While the petitioner's Petition for Appeal was filed out of time, as noted by the respondent, the SCAWV accepted the late filing and considered the Petition for Appeal, notwithstanding

its tardiness.  (ECF No. 13 at 28).  Although the petitioner further asserts that the Petition for Appeal was denied by the SCAWV, a review of the record demonstrates that the petition was not refused as untimely.  (ECF No. 12, Exs. 2-5).  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the petitioner cannot demonstrate the requisite prejudice under *Strickland* in order to succeed on this claim.

For all the reasons stated herein, the undersigned proposes that the presiding District Judge **FIND** that the that the petitioner has not demonstrated that the state courts' decisions denying the petitioner habeas corpus relief concerning his claims of ineffective assistance of counsel were contrary to, or an unreasonable application of, clearly established federal law, and that the respondent is entitled to judgment as a matter of law on all of the claims alleged in Ground 3 of the petitioner's section 2254 petition.

### D. Denial of fair and impartial jury because trial court denied motion for change of venue.

In Ground Five of his federal petition, the petitioner asserts that he was denied a fair and impartial jury trial when the trial court denied his Motion for Change of Venue. (ECF No. 1 at 14-15).  In support of this claim, the petitioner contends that, prior to trial, Don Richardson Associates ("DRA") conducted a survey of Mercer County residents concerning the charges against the petitioner.  The petition further states:

> The survey revealed that sixty-one percent (61%) of the residents of Mercer County, WV had knowledge that Petitioner and Mr. Graham[7] were charged with murder in the first degree.  These individuals indicated that they had acquired their knowledge of the case through the mass media. Thirty-eight percent of the respondents to the survey had formed an opinion of petitioner and his guilt.  Of the individuals who had formed

---

[7]  As stated elsewhere in the petitioner's filings, and as supported by the record as a whole, Graham was never charged with any offenses related to the Bennett incident.

some type of opinion, eight out of ten had formed a negative opinion of this petitioner.

The local newspaper, the *Bluefield Telegraph*, designated their coverage of the Losey Bennett Homicide as the top news story of 2008. See, *Bluefield Telegraph*, January 2, 2009. In this case, the local media felt strongly enough about the crime attributed to petitioner to make the facts and circumstances surrounding this matter its primary story. The *Bluefield Telegraph* is the only general newspaper serving Bluefield, West Virginia, a Class II city, with a population of approximately 10,477 inhabitants. (In 1998, it had a paid subscription of 22,649 on weekdays and 24,703 on Sunday). There is no other newspaper in the community. The second largest city publishes a weekly newspaper, *The Princeton Times*. The *Bluefield Telegraph* is clearly the dominant print media in Mercer County.

(ECF No. 1 at 14-15). The petitioner further contends that, even though defense counsel made a motion to change venue, the trial court denied it, and the petitioner was forced to use his six peremptory challenges, but still had other jurors who sat on his jury panel who may have been improperly influenced by the extensive media coverage of his case, or otherwise had some actual bias concerning this case. (*Id.* at 15).

In particular, the petitioner contends that Carol Root, who sat on his jury, had formerly worked as a probation officer and knew the prosecuting attorney in his official capacity. The petitioner further contends that another juror, Charlotte Ann Russ, admitted that she had watched television reports on the Bennett homicide and read articles about it in the *Bluefield Telegraph*. (*Id.* at 15). The petitioner repeats these assertions in his Memorandum in Support of his section 2254 petition. (ECF No. 2 at 13-14). The petitioner's Memorandum also cites applicable Supreme Court precedent concerning the right to an impartial jury free from outside influence. *See Duncan v. Louisiana*, 391 U.S. 145, 149 (1968); *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966). (*Id.* at 14).

The respondent's Memorandum of Law in support of his Motion for Summary Judgment disputes the petitioner's characterization of the survey conducted about his trial.  The respondent contends as follows:

> In denying the motion for a change of venue, the circuit court concluded that, of 207 Mercer County citizens interviewed, only 61% heard of the case.  Resp't's Ex. 17 at 158, Resp't's Ex. 9 at 13.  Of those, 48 had formed an opinion.  Resp't's Ex. 17 at 159, Resp't's Ex. 9 at 13.  Of those who had an opinion, 54% said they could presume the Petitioner innocent.  [Resp't's] Ex. 17 at 159, Resp't's Ex. 9 at 13.  The circuit court found that more people had a positive view of the petitioner's right to a fair trial than not.  Resp't's Ex. 9 at 14-15.
>
> Moreover, simply because someone interviewed might have formed an opinion of guilt or innocence based upon media information is insufficient to justify a change of venue.  The Supreme Court has observed that with "widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case."  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

(ECF No. 13 at 30).

The respondent's Memorandum of Law further asserts that, in denying the Motion for Change of Venue, the trial court correctly found that "mere widespread publicity in and of itself does not require a change of venue."  (*Id.*, citing Order Denying Habeas Petition, ECF No. 11, at 14).  The respondent's Memorandum of Law further states:

> The United States Supreme Court has found media coverage to void a conviction when "a trial atmosphere . . . [was] utterly corrupted by press coverage[.]"  *Skilling v. United States*, 130 S. Ct. 2896, 2914 (2010).  Here, though, "[t]here is nothing in the record to suggest that this publicity was anything other than factual reporting.  There is no suggestion of a circus atmosphere or lynch mob mentality, or that a suppressed confession was broadcasted, or of any other community-wide rush to judgment that infected other trials that have been set aside for lack of an impartial jury."  *Stafford v. Saffle*, 34 F.3d 1557, 1566 (10th Cir. 1994).  Without such showings, the state court decision cannot be said to be contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

(ECF No. 13 at 31).

Finally, the respondent's Memorandum of Law asserts that the two jurors singled out by the petitioner did not exhibit any actual bias or prejudice against the petitioner that would warrant a new trial.  The respondent discusses each juror's circumstances as follows:

> Ms. Root explained at *voir dire* that she did know the prosecuting attorney from her time as a probation officer, but that she would not give his arguments any more or less weight because of that, nor would she put any more or less weight on the State's witnesses because of that.  Resp't's Ex. 21 [sic; Ex. 19] at 33.  Ms. Root also stated she could be fair.  *Id.*

> Ms. Russ stated in *voir dire* that she had seen the crime reported on the television news and read about it in the *Bluefield Telegraph*.  *Id. at 57.* Ms. Russ testified that this would not bias her and that she could sit with an open mind and render a fair and honest verdict.  Resp't's Ex. 21 [sic; Ex. 19] at 57-58.  She stated categorically she could disregard what she read and heard and base her verdict solely on the evidence adduced at trial.  *Id.* at 58.  Indeed, at the end of this *voir dire*, the Petitioner's counsel affirmatively indicated he had no objection to Ms. Russ.  *Id.* at 59. "Prominence does not necessarily produce prejudice and juror *impartiality*, we have reiterated, does not require *ignorance*." *Skilling*, 130 S. Ct. at 2914-15.

*Id.* at 31-32).   Thus, the respondent contends that the petitioner has failed to demonstrate any basis for a violation of his right to a fair and impartial jury or his due process rights.  (*Id.*)

The petitioner's Reply reiterates his characterization of the Mercer County survey, claiming that eight of ten selected individuals had decided the petitioner was guilty.  (ECF No. 20 at 30-32).  The petitioner further contends that his position is supported by the Supreme Court's opinion in *Irvin v. Dowd, supra*, in which the Court found actual prejudice because almost 90% of those who were examined entertained some opinion of guilt.  366 U.S. at 727.  (*Id.* at 31).

In denying the petitioner's Motion for Change of Venue, Judge Sadler made the following findings:

> Of the 207 people contacted, 109 or 53% felt that the defendant could receive a fair trial in Mercer County. 31 people, 15% of the total contacted, opined that the defendant could not receive a fair trial. The remaining 67 people contacted, or 32%, did not know [ sic;] express an opinion of a fair trial.
>
> * * *
>
> Based upon the report of Mr. Richardson, this Court cannot find that such a hostile sentiment exists against the defendant. The Court notes that a majority of those interviewed had heard about the case. "Generally, however, the mere existence of widespread publicity is not, in and of itself, sufficient to require a change of venue, nor is mere proof that prejudice exists against the accused." *State v. Williams*, 172 W. Va. 295, 303 305 S.E.2d 251, 259 (1983) *citing State v. Boyd*, 167 W. Va. 385, 280 S.E.2d 669 (1981); *State v. Pratt*, 161 W. Va. 530, 244 S.E.2d 227 (1978). *See also, State v. Hamric*, 151 W. Va. 1, 151 S.E.2d 252 (1966). In other words, "[w]idespread publicity, of itself, does not require change of venue, and neither does proof that prejudice exists against an accused, unless it appears that the prejudice against him is so great that he cannot get a fair trial." Syl. Pt. 2, *State v. Young*, 173 W. Va. 1, 311 S.E.2d 118 (1983) *quoting* Syl. Pt. 1, *State v. Gangwer*, 169 W. Va. 177, 286 S.E.2d 389 (1982).
>
> In this survey, of those who had some prior knowledge, the overwhelming portion had not formed any opinion about this case. With those forming an opinion, less had a negative opinion of the defendant than those who did not. As Justice Cleckley has stated: "Neither the statutes nor the West Virginia Constitution require that jurors be totally ignorant of the issues and facts involved." *State v. Derr, supra*, 192 W. Va. at 171, 451 S.E.2d at 737. *See State v. Doman*, 204 W. Va. 289, 512 S.E.2d 211 (1998) (upheld denial of change of venue following survey evidence similar to case at bar).

(ECF No. 12, Ex. 9 at 15-16). The petitioner raised the denial of his Motion for Change of Venue in his direct appeal; however, he raised it as a matter of trial court error, and abuse of discretion. Although he not specifically assert a federal constitutional violation, he did cite to *Sheppard v. Maxwell*, 384 U.S. 333 (1966), and generally discussed the alleged actual prejudice concerning his case in Mercer County. The petitioner did not

raise this issue again in his state habeas proceedings.   Nevertheless, while it is questionable whether this claim has been properly exhausted, it does appear that the petitioner fairly presented the basis of his claim to the state courts.

A defendant is guaranteed a trial by an impartial jury under the Sixth and Fourteenth Amendments.  *See, e.g., Duncan v. Louisiana*, 391 U.S. 145, 149 (1968); *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due Process requires that the accused receive a trial by an impartial jury free from outside influence.").   "The 'essential function of voir dire is to allow for the impaneling of a fair and impartial jury through questions which permit the intelligent exercise of challenges by counsel . . . .'" *United States v. Brown*, 799 F.2d 134, 135-36 (4th Cir. 1986) (other citations omitted).

The United States Court of Appeals for the Fourth Circuit has stated that "[m]atters of change of venue are committed to the sound discretion of the trial court . . . ." *Tuggle v. Thompson*, 57 F.3d 1356, 1364 (4th Cir.), *overruled on other grounds by Tuggle v. Netherland*, 516 U.S. 10 (1995).  The trial judge ruling on a motion for change of venue "is advantaged by his perspective on prevailing sentiments and is thus given broad latitude in conducting voir dire and is afforded considerable deference by the reviewing courts." *Mu'Min v. Virginia*, 500 U.S. 415, 423 (4th Cir. 1991).

Absent contrary indications, jurors are presumed to be impartial.  *Poynter v. Ratcliff*, 874 F.2d 219, 221 (4th Cir. 1989).  Moreover, courts will presume that jurors will follow the court's instructions, including the admonishment to avoid any media coverage of the trial.  *Jones v. United States*, 527 U.S. 373, 394 (1999).  The defendant bears the burden of showing a strong possibility of juror bias.  *Wells v. Murray*, 831 F.2d 468, 472 (4th Cir. 1987).

Standing alone, juror exposure to media coverage concerning a defendant's charges does not presumptively deprive the defendant of due process. *Murphy v. Florida*, 421 U.S. 794, 799 (1975). Prejudice may be presumed, however, when pre-trial and mid-trial publicity is so invasive that the setting of the trial becomes "inherently prejudicial." *Id.* at 803; *see also Sheppard*, 384 U.S. at 352, 363.

A petitioner seeking federal habeas corpus relief based on the denial of a change of venue must show actual prejudice or that there is a presumption of prejudice because the proceedings involved "such a probability that prejudice will result that it is deemed inherently lacking in due process." *Estes v. Texas*, 381 U.S. 532, 542-43 (1965). Thus, "[a] change of venue is required as a matter of constitutional law only where the jury pool is tainted 'by so huge a wave of public passion' that the impaneling of an impartial jury is impossible." *Mu'min v. Pruett*, 125 F.3d 192, 199 (4th Cir. 1997) citing *Irvin v. Dowd*, 366 U.S. 717, 728 (1961).

In order to establish actual prejudice, a petitioner must demonstrate "the actual existence of [] an opinion in the mind of the juror as will raise the presumption of partiality." *Murphy*, 421 U.S. at 800 (internal quotation marks omitted) (quoting *Irvin*, 366 U.S. at 723). Merely citing to pretrial publicity or a preexisting knowledge of the facts of the case by jurors is not enough. The petitioner must point to *voir dire* testimony and the record of publicity to demonstrate "the kind of wave of public passion that would have made a fair trial unlikely by the jury that was impaneled as a whole." *Patton v. Yount*, 467 U.S. 1025, 1040 (1984).

In the instant case, the trial court did not find sufficient indicia of overwhelming invasive media coverage or a wave of public passion that would make a trial in Mercer County inherently prejudicial. Furthermore, during the jury empanelment, Judge

68

Sadler permitted the parties to conduct individual *voir dire*. While there may have been a great deal of media coverage concerning Bennett's death and the petitioner's trial, each of the potential jurors was individually questioned about their knowledge of the case based upon pre-trial media coverage. None of the potential jurors who remained on the jury admitted under oath that they had formed any bias based upon the media coverage. Thus, the petitioner has not demonstrated any inherent prejudice. Furthermore, during jury selection, if the petitioner believed that Ms. Root or Ms. Russ was actually biased, he could have used his peremptory challenges to strike both of them.

The petitioner has not shown that his conviction was fundamentally unfair because of prejudicial media exposure. Moreover, the petitioner has failed to demonstrate that any outside source had a substantial and injurious effect or influence on the jury's verdict. Furthermore, because there was no prejudice to the petitioner's defense from pre-trial publicity, there was no prejudice from the failure to grant a change of venue.

The undersigned further proposes that the presiding District Judge **FIND** that the petitioner has not demonstrated that the state courts' denial of habeas corpus relief was contrary to, or an unreasonable application of, clearly established federal law, and that the respondent is entitled to judgment as a matter of law on Ground Five of Petitioner's section 2254 petition.

## RECOMMENDATION

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the respondent's Motion for Summary Judgment (ECF No. 12), **DENY** the petitioner's Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 1), and dismiss this civil action from the docket of the court.

69

The parties are notified that this Proposed Findings and Recommendations is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, Senior United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the district court and a waiver of appellate review by the circuit court of appeals.  *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce,* 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on the opposing party and Judge Faber.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to Petitioner and to transmit a copy to counsel of record.

_____August 22, 2014_____
           Date

Dwane L. Tinsley
United States Magistrate Judge

70